**ANTARCTIC SUPPORT ASSOCIATES,**
a joint venture Plaintiff,

v.

**The UNITED STATES, Defendant,**

and

**Raytheon Technical Services Company,**
Defendant–Intervenor.

**BR & S Polar Resources, Plaintiff,**

v.

**The United States, Defendant,**

and

**Raytheon Technical Services Company,**
Defendant–Intervenor.

**No. 99–937C, 99–948C.**

United States Court of Federal Claims.

---

Filed under seal: Jan. 28, 2000.
Published with redactions: Feb. 10, 2000.[1]

1. The opinion was issued under seal on January 28, 2000. The opinion has been redacted and is now published. Redacted portions are denoted by ellipses.

William A. Roberts, III, Wiley, Rein & Fielding, Washington, D.C., with whom on the brief were Rand L. Allen, Kevin J. Maynard, William Lieth, and Derek A. Yeo, for plaintiff Antarctic Support Associates.

Michael R. Charness, Vinson & Elkins, LLP, Washington, D.C., with whom on the brief were Kathleen C. Little, David R. Johnson, Robert Rothwell and Philip A. Nickles, for plaintiff BR & S Polar Resources.

James W. Poirier, Commercial Litigation Branch, U.S. Department of Justice, Washington, D.C., with whom on the brief were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, and Kirk T. Manhardt, Assistant Director, for defendant United States.

Thomas J. Madden, Venable Baetjer Howard and Civiletti, LLP, Washington, D.C., with whom on the brief were Lars E. Anderson, Paul Wengert, Sharon L. Larkin, Carla D. Craft, Rebecca E. Pearson, and Andrew S. Gold, for defendant-intervenor Raytheon Technical Services Company.

## OPINION

MARGOLIS, Senior Judge.

This bid protest is before the Court on the parties' cross-motions for judgment on the Administrative Record. Plaintiffs seek injunctive and declaratory relief, requesting that the Court declare that the award to defendant-intervenor was arbitrary and capricious and without a rational basis and issue a permanent injunction restraining the United States of America and its agent the National Science Foundation (NSF) from taking any actions to procure goods and services identified in the solicitation. In turn, defendant and defendant-intervenor request that the Court deny plaintiffs' motions, and instead find that defendant and defendant-intervenor are entitled to judgment as a matter of law. Because defendant's award was an appropriate exercise of discretion, and neither arbitrary nor capricious, plaintiffs' motions are denied, and defendant and defendant-intervenor's motions are granted.

### FACTS

#### I. PROCEDURAL HISTORY OF THE CASE

Some of the facts recited are taken from the Court's opinion, dated November 24, 1999, denying Plaintiff Antarctic Support Associates' motion for a temporary restraining order. Plaintiff Antarctic Support Associates (ASA) is currently performing a contract for Science, Operations and Maintenance Support for the National Science Foundation (NSF) in Antarctica which runs until March 31, 2000.

On September 14, 1998, NSF issued a Request for Proposals (RFP), Solicitation No. OPP 98–001, for the follow-on contract for the United States Antarctica Program (USAP). The Statement of Work in the RFP included a wide range of tasks required of the contractor, including:(1) *General Management;* (2) *Logistics;* (3) *Station and Ship Operations;* (4) *Science Support;* (5) *Information Technology and Information Systems;* and (6) *Facilities Engineering and Construction. See* RFP §§ C7.1—7.6.

The period of the contract is a base period of five years, to be followed by one five-year

option period, and it is a cost-plus-award fee contract. *See id.* §§ B2, L2 (incorporating FAR § 52.216–1). According to the RFP, the offeror "which provides the greatest value to the Government" should be awarded the contract. *See id.* § M1.

Five proposals were received in response to the RFP. Three offerors, Raytheon Polar Services, Inc. (Raytheon), Antarctic Support Associates (ASA) and BR & S Polar Services (BR & S), were selected for further discussions with NSF. Following the discussions, proposal revisions in the form of best and final offers (BAFOs) were submitted on August 2, 1999. On September 20, 1999, NSF reopened discussions and requested a second round of BAFOs, which were submitted on October 4, 1999.

The bidders were notified on October 28, 1999 that NSF had decided to award the contract to Raytheon Polar Services Company, a division of Raytheon Technical Services Company.

ASA and BR & S filed timely bid protests pursuant to 31 U.S.C. §§ 3551–3553 at the General Accounting Office challenging the award of the USAP Contract to Raytheon. This action was filed by ASA on November 16, 1999, against the defendant United States, acting through the NSF. Raytheon's motion to intervene was granted by the Court on November 18, 1999. ASA's motion for a temporary restraining order was denied by this Court on November 24, 1999.

BR & S filed a complaint in this court regarding the same RFP and award on November 22, 1999. Raytheon's oral motion to intervene in that action was granted November 30, 1999. The ASA and BR & S actions were consolidated on December 21, 1999.

Plaintiffs were allowed to take four depositions. The deposition of Bart M. Bridwell, contract specialist for NSF, was taken on January 3, 2000. The deposition of William A. Bryant, contracting officer for this procurement and chair of the business management panel, was taken on January 3, 2000. The deposition of Erick Chiang, head of the Polar Research Support Section of the Office of Polar Programs, was taken on January 4, 2000. The deposition of Robert B. Hardy, the Source Selection Official for this procurement, was taken on January 4, 2000.

Plaintiffs filed their motions for summary judgment on January 10, 2000. The defendant and defendant-intervenor filed their responses and cross-motions for summary judgment on January 14, 2000. Plaintiffs filed their replies on January 17, 2000. Defendant-intervenor filed a reply on January 18, 2000. A hearing was held on January 18, 2000.

## II. STATEMENT OF RELEVANT FACTS

Four evaluation areas were set out in the RFP: (1) *Technical;* (2) *Cost/Price;* (3) *Past Performance;* (4) *Other Factors. See* RFP § M2. Notice was given that these areas would be weighted with *Technical Factors* designated as more important than *Cost/Price. See id.* § M1. *Past Performance* would be based on previous similar contracts, identified by the offeror, to determine the performance risk on an adjectival rating of "low," "medium," or "high." *See id.* §§ M1, M2.3, L7.6. *Other Factors,* according to the RFP, would not be weighted or scored, but would be rated instead as "plus," "neutral," or "minus." *See id.* § M2.4. The RFP expressly provided that NSF would evaluate the proposals for technical feasibility, risk, financial capability to perform and cost realism. Evaluation Plan, AR Binder 3, Item # 0020 at 336–38.

The agency used three panels to perform the overall evaluation of proposals—the technical proposal evaluation committee (TPEC), the performance risk analysis committee (PRAC) and the business management panel (BMP). The TPEC was made up of nine experts and was responsible for determining the relative merits of the proposals in accordance with the technical evaluation factors. The PRAC was made up of six experts and was required to assess the potential risk of contracting with the offeror. The BMP was made up of five experts and was required to evaluate price and other factors.

### A. Technical Evaluation by TPEC of the Proposals

The TPEC was to evaluate the proposals based on five factors: (1) *Concept of Opera-*

tions;[2] (2) *General Management and Human Resources*;[3] (3) *Science Support*;[4] (4) *Project Models*;[5] and (5) *Phase–In Plan*.[6] RFP at § M. Section L of the RFP provided additional guidance to the offerors as to what the evaluators were expecting under the *Concept of Operations* factor. The information was to be organized into four main categories: (a) Logistics; (b) Station and Ship Operations; (c) Information Technology (IT) and Communications Systems; and (d) Facilities Engineering and Construction. RFP at § L7. These categories were not set out as subfactors and no particular weight was given to any of them. Overall, the TPEC was charged with assessing each offeror's approach to providing "integrated planning and organization required each season and in the long term in order for USAP to satisfy its commitment to excellence in science." Evaluation Plan, AR Binder 3, Item # 0020 at 336.

### 1. *Competitive Range Determination*

Initial proposals were received from five offerors. The members of TPEC received copies of the proposals on March 18, 1999. The TPEC met during May 3—5, 1999, to review the initial proposals. The TPEC submitted its initial report to the Source Selection Official on May 26, 1999. TPEC Initial Report, AR Binder 4, Item # 0030. The

following discussion summarizes some of the relevant portions of the initial determination.

#### i. *ASA*

The TPEC found that ASA had a number of major strengths under the *Concept of Operations* factor, but was concerned about the IT aspects of ASA's proposal. *Id.* The panel noted that "the IT plan lacks substance and does not address in a credible way the development of the technology infrastructure that is integral to many parts of the proposal." *Id.* The panel went on to address a number of other problems in the IT area, ending with the observation that the listed problems were "only a few of the long list of IT concerns, which taken together add up to a big problem." *Id.*

#### ii. *BR & S*

The panel found that BR & S had a strong IT/communications aspect and noted a "demonstrated courage/commitment to review/investigate/explore innovative ideas and processes." *Id.* The panel, however, found a major weakness in that "no discussion or information is provided in the proposal for several key operational functions, including vehicle repair shops, crash/fire, waste management, fuels, power and water production, housing, food services and medical." *Id.*

#### iii. *Raytheon*

The panel found that Raytheon's proposal had major strengths in the areas of "corpo-

**2.** "*Concept of Operations* (refer to Technical Proposal Tab 7) will be evaluated to assess the offeror's approach to providing the integrated planning and organization required each season and in the long term in order for USAP to satisfy its commitment to excellence in support of science." RFP § M2.1.1, AR Binder 3, Item # 0020, at 336.

**3.** "*General Management and Human Resources* (refer to Technical Proposal Tab 3–5, 9) will be evaluated to assess the adequacy of the offeror's techniques for attracting and maintaining manpower and skill mix, the offeror's management structure, lines of communication, and levels of authority and responsibility to insure that necessary material and labor resources are available to effectively provide support to NSF, other USAP participant organizations, and NSF sponsored researchers." RFP § M2.1.2, AR Binder 3, Item # 0020, at 336.

**4.** "*Science Support* (refer to Technical Proposal Tab 6) will be evaluated to assess the offeror's approach to supporting a basic research environment throughout the USAP to promote excel-

lence in scientific research." RFP § M2.1.3, AR Binder 3, Item # 0020, at 336.

**5.** "*Project Models* (refer to Tab 10) will be evaluated to assess the offeror's understanding and comprehension of the Statement of Work, specifically the offeror's approach to addressing the technical and management complexities inherent in the specific scenarios." RFP § M2.1.4, AR Binder 3, Item # 0020, at 336.

**6.** "*Phase-in Plan* (refer to Tab 8) will be evaluated to assess the offeror's demonstrated ability to assume full contractual responsibility for the entire Statement of Work without degradation of high quality services at the beginning of the period of performance upon completion of the phase-in period.... THIS ELEMENT WILL NOT BE SCORED BUT CONSIDERED BY THE SOURCE SELECTION OFFICIAL AS AN "OTHER FACTOR." IT WILL RECEIVE AN ADJECTIVAL RATING." RFP § M2.1.5, AR Binder 3, Item # 0020, at 336–37.

rate expertise and intellectual infrastructure in IT, logistics support, station and ship operations, and facilities engineering and construction." *Id.* The panel noted that the "IT plan stands out in its innovation, with the possibility that 24-hour/7-day communications among all major parts of the USAP could lead to productive alternative approaches in the operations of the entire enterprise." *Id.* The panel was impressed with Raytheon's proposal to utilize the Iridium [ . . . ] as "a unique and innovative solution for the reliable delivery of continuous, [ . . . ] communications to the South Pole." *Id.* (referred to throughout this opinion as the "Iridium solution"). The panel was cautious, however, and noted that it needed to consider the "cost/benefit and long term availability of this system." *Id.* The panel found that Raytheon had major weaknesses in that the "proposal provides no substantive discussion or description of food service, housing facilities maintenance, Crash/Fire, power and water plant, or fuels for any station." *Id.* Other major weaknesses were noted as well. *Id.*

**2. *Discussions and Evaluations of BAFOs***

In May 1999, NSF engaged in discussions with the three offerors in the competitive range and submitted written questions to each of them. On July 16, 1999, NSF requested that the three offerors submit their best and final offers (BAFOs) to NSF by August 2, 1999. The TPEC met the entire day of August 16, 1999, to discuss the strengths and weaknesses of each offer in light of the changes made in their proposals since the initial proposals of March 15, 1999 and to discuss the BAFOs. Summary of Discussions of Technical Panel, August 16, 1999, AR Binder 4A, Item # 0040 at unnumbered 1. The panel reviewed all of the major strengths and weaknesses of each of the initial proposals and then discussed whether those weaknesses still persisted in the BAFO proposals. *Id.* A chart of the panelists' initial and BAFO scores was made. *Id.* at unnumbered 2. The TPEC members then engaged in a comparative discussion on the merits of the three proposals and ultimately voted to eliminate BR & S from further consideration. *Id.* at unnumbered 1. During the discussion of Raytheon and ASA, "Raytheon was portrayed as more innovative and the better choice for long term progress of the USAP, whereas ASA was portrayed as a highly reliable contractor that would provide better service in the short term." *Id.* After further discussion, "the majority of the Panel [7–2] voted to recommend Raytheon as the Panel's choice to the Selecting Official." *Id.* The panel found Raytheon to be superior to ASA in *Concept of Operations, General Management and Human Resources,* and *Science Support.* Chiang Depo. at 130–37.

The following is a discussion of particularly pertinent parts of the TPEC's evaluation of the BAFOs. It is not intended to be comprehensive.

### i. *ASA*

The panel "agreed that almost all of the major strengths identified in the initial proposal persist in the BAFO." Technical Panel Final Report, AR Binder 4A, Item # 0040. During the discussions, the panel addressed several questions to ASA regarding the IT/Communications aspect of its proposal. After reviewing the responses and the BAFO, the panel was still very concerned about "a general lack of innovation in the IT area on the part of ASA." *Id.* "No solution is offered to the most pressing current IT concern, namely bandwidth to the South Pole. The attitude still appears to be to wait and see what the Government comes up with. Concerns remained that Allied Signal would not be used optimally and that Allied Signal had [not] been integrated into the company to a sufficient extent." *Id.*

The panel was also concerned about the sale of the technical services business segment of EG & G, Inc., part of ASA, and questioned ASA on the potential impact of the sale on ASA's proposal. Discussion Question 51, AR Binder 11, Item # 0180. In response, ASA provided a written guarantee from EG & G, Inc., the parent of EG & G Technical Services, Inc. that it would require as a condition of sale "that the purchaser maintain all existing contractual commitments." AR Binder 38, Item # 1300, ASA Response to Question 51. EG & G, Inc. further guaranteed full and prompt payment

and performance of existing and future obligations arising under the contract. *Id.* Holmes & Narver Services, Inc., the other member of ASA's joint venture, also provided an unconditional guarantee. *Id.* Subsequently, EG & G, Inc. sold EG & G Technical Services to the Carlyle Group. ASA stated in its BAFO that "[t]he Carlyle Group will maintain all existing EG & G Technical Services contractual commitments." AR Binder 34, Item # 1110 at 11–13.

Nevertheless, the TPEC was unsatisfied with ASA's explanation of its sale of EG & G to the Carlyle Group and found this to be a change that weakened ASA's initial proposal. EG & G was believed to be the joint venture partner capable of technical innovation, and the extent of innovation by the Carlyle Group was questioned. AR Binder 4A, Item # 0040. TPEC also assigned ASA a "minor weakness" under *Concept of Operations* concluding that "[t]he need to utilize Allied Signal maximally is exacerbated by the recent acquisition of EG & G by the Carlyle Group." *Id.* TPEC also assigned ASA a minor weakness under the *Science Support* factor noting that several members had "[c]oncern[s] about the possible loss of input in this area from EG & G." *Id.*

### ii. *BR & S*

The panel noted that all of the major strengths of the initial proposal persisted in the BAFO. *Id.* It also noted that the weaknesses of the original proposal still largely persisted in the BAFO. Despite the fact that the Contracting Officer sent a letter informing BR & S that NSF had received detrimental past performance information regarding [ . . . ], the panel remained troubled "that the concerns expressed in the earlier review and in the oral discussions regarding [ . . . ] have not been dealt with." *Id.* The panel found that:

> There is no action plan in the BAFO for ensuring performance by this subcontractor, who would have responsibility for absolutely critical aspects of station operations, including the handling of fuels and the operation of power plants. Unfortunately, the trial period for the subcontractor would be the austral winter, when replacement, repair or other remedial measures would be impossible. Failure in these areas of operations could be catastropic (sic).

AR Binder 4A, Item # 0040. Further discussion of BR & S's proposed use of [ . . . ] as a subcontractor appears in the discussion regarding the Performance Risk Assessment Committee's decision, below.

### iii. *Raytheon*

The Panel found that almost all of the major strengths identified in the initial proposal persisted in the BAFO. *Id.* The Panel found that most of the significant weaknesses noted in the initial review had been addressed satisfactorily in the BAFO.

With regard to the Panel's initial concerns about Raytheon, NSF submitted a series of questions regarding Raytheon's proposed use of the Iridium constellation for Antarctic telecommunications. *See* Question # 23, AR Binder 63, Item # 3300. In response to NSF's concerns, Raytheon described the "much maligned business posture of Iridium LLC" as both "a risk and an opportunity for the USAP." Raytheon BAFO, Vol. II at II–253, AR Binder 60, Item # 3110. Raytheon explained:

> It is Raytheon's belief that the current discussions regarding bankruptcy and liquidation of Iridium are merely negotiations in the press. Motorola, the primary investor in Iridium, has been quoted as saying that liquidation is a worst-case scenario, and that Motorola still thinks it is possible for Iridium to develop a viable business plan. In the event of a worst-case scenario, Raytheon believes that the constellation has value and will not go away. There are buyers waiting in the wings to purchase this valuable asset at pennies on the dollar. A new service provider would have less capital costs to amortize. As such, liquidation of the current commercial Iridium venture could provide a cost benefit to the USAP [ . . . ] concept.

AR Binder 4A, Item # 0040. The Panel was convinced by Raytheon's explanation. It found that "despite Iridium's current financial difficulties, it is likely that the satellite constellation would continue to be operated

after emerging from any legal or other proceedings." *Id.*

### B. PRAC's Evaluation of the Proposals

The PRAC committee was to evaluate the performance risk involved in contracting with a particular organization:

The PRAC shall assess the potential risk of contracting with the offeror (as opposed to a straight-forward assessment of past performance) by contacting a significant number of contact references identified by the offeror, and using its best efforts to obtain a response to a past performance questionnaire being developed. It is likely that several offers will be received from teams with a number of participants. In these instances, the PRAC shall seek references on all team members.... The panel will evaluate all proposals, and information developed from the questionnaire and on its own initiative from independent sources, and prepare a report to the Source Selection Official....

Evaluation Plan, AR Binder 1, Item # 0010, at unnumbered 7.

The PRAC submitted an initial report on the five proposals to the Source Selection Official on May 7, 1999. AR Binder 10, Item # 0080. The initial report evaluated ASA as "low risk." *Id.* It evaluated BR & S as "medium risk," and commented that [...] was not qualified to perform the work, which contributed to its evaluation of BR & S as medium risk. *Id.* It evaluated Raytheon as "medium risk," due to Raytheon's perceived inexperience in the areas of engineering and construction. *Id.*

After it reviewed the BAFOs, the PRAC submitted its final report to the Source Selection Official on August 13, 1999. AR Binder 10, Item # 0090. The PRAC found that ASA had actually reduced its overall risk and concluded that ASA's risk factor was low. *Id.*

The PRAC assigned BR & S a rating of "low risk," but was still concerned that BR & S had stated that they would continue with [...] as a subcontractor in their proposal. *Id.* BR & S "stated that if poor performance

resulted, BR & S would remove [...] from the contract." *Id.* The PRAC committee stated that it still considered "the retention of [...] to be a weakness based on [...] past performance." *Id.*

The PRAC assigned Raytheon a rating of "low risk." It found that Raytheon had adequately demonstrated it had experience in facilities design and in construction at remote, hostile locations.

The PRAC concluded that the panelists were "unanimous in their rating of ASA as the lowest risk of all three finalists." *Id.* "This was based more on the positive aspects of ASA as opposed to any weaknesses presented by [Raytheon]." *Id.*

### C. BMP's Evaluation of the Proposals

The BMP was required to evaluate price to "assess the realism of the proposed costs and determine the probable cost to the government." AR Binder 1, Item # 0010 at Section IV.C. The BMP submitted its initial report to the Source Selection Official on May 25, 1999. AR Binder 5, Item # 0050. The BMP addressed the various cost proposals of the offerors and calculated appropriate "should cost" numbers for all of the offerors. *Id.* The BMP also performed a Financial Capability Evaluation and calculated a score for each of the offerors and their joint venture partners and critical subcontractors. *Id.* at 8. The BMP was concerned that Phillips Services Corporation, a proposed subcontractor of ASA, was experiencing serious financial difficulty and had filed for debt reorganization in Canada and the United States. *Id.* The BMP also noted that [...], a proposed subcontractor of BR & S, "received very deficient performance ratings from two agencies identified by NSF on its own initiative." *Id.* at 9.

The BMP submitted its final report to the Source Selection Official on October 14, 1999. AR Binder 5, Item # 0060. The BMP found that Raytheon had the lowest "should cost" at $1,255,298,791, ASA had the next higher "should cost" at $[...] and BR & S had the highest "should cost" at $[...].[7] *Id.; see*

---

7. During this proceeding, a mistake that Raytheon made in its proposal was discovered.

*also* Memorandum dated 10/27/99 from William Bryant to Robert Hardy amending the BMP's Final Report, AR Binder 5, Item # 0060. Based on all information, the BMP recommended the contract award be made to Raytheon.

### D. Source Selection Official's Award

The Source Selection Official, Robert Hardy, was responsible for making the "contract award on the basis of the written findings presented to him by the TPEC, PRAC and the BMP." AR Binder 1, Item # 0010 at Section XII. The SSO was to consider "all relevant factors and make the selection on the basis of the proposal deemed to be most advantageous to the Government." *Id.* He was to evaluate the proposals for technical feasibility, risk, financial capability to perform the contract and cost realism. AR Binder 3, Item # 0020 at 336–38. The combined technical factors were more important than the cost/price factor. *Id.* at 336. The Source Selection Memorandum summarizes the various panel reports and was signed by Hardy on October 27, 1999. AR Binder 1, Item # 0001. Based on the recommendations of the various panels, Hardy determined that Raytheon represented the best value to the Government and selected Raytheon as the contract recipient under RFP No. OPP98–001. *Id.*

### *DISCUSSION*

ASA alleges that the contract award should be set aside for six reasons:

1. NSF's selection of Raytheon was based on an unpriced proposal to deliver critical services through a bankrupt satellite system, and as such was arbitrary, capricious and contrary to law.

2. NSF's award to Raytheon, based on a perceived strength in IT/Communications, represented a clear departure from the announced evaluation scheme.

3. NSF engaged in improper post-BAFO discussions with Raytheon regarding its proposed Iridium solution.

4. NSF failed to properly mitigate a conflict of interest resulting from the financial holdings of two NSF evaluators.

5. NSF engaged in disparate treatment in its evaluation of proposals.

6. NSF failed to conduct a meaningful cost evaluation.

BR & S alleges that the contract award should be set aside for four reasons:

1. NSF failed to rationally evaluate Raytheon and its Iridium solution.

2. NSF improperly weighted Raytheon's Iridium information technology solution.

3. NSF arbitrarily or irrationally downgraded BR & S on account of [. . .], a subcontractor that BR & S had removed from its proposal.

4. NSF conducted post-BAFO discussions that were prejudicial to BR & S.

This Court will address each allegation in turn. For brevity and convenience, this Court will not address separately allegations made by both ASA and BR & S.

Motions for judgment upon the administrative record are treated in accordance with the rules governing motions for summary judgment. *See* RCFC 56.1; *Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd.* 113 F.3d 1255 (Fed.Cir.1997). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Viewing the evidence in a light most favorable to the non-moving party, a moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it might significantly affect the outcome of the suit under the governing law. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has satisfied its burden, the opposing party must proffer

---

Consequently, Raytheon's real advantage over ASA was $[. . .] million, not $[. . .] million as the BMP had indicated during the evaluation proceedings. *See* Transcript of Hearing of January 18, 2000 at 118; *see also* Bridwell Depo. at 186–87.

"specific facts showing that there is a genuine issue for trial." *See* RCFC 56(e); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When a case is before the court on cross-motions for summary judgment, each motion is evaluated under this standard. *See Cubic Defense Sys., Inc. v. United States*, 45 Fed.Cl. 450 at 457 (1999); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

The Court has jurisdiction of this post-award bid protest under the 1996 Amendments to the Tucker Act. *See* 28 U.S.C. § 1491(b)(1) (West 1994 & Supp. II 1996). The Court reviews the challenged agency action according to standards set out in the Administrative Procedure Act (APA). *See* 5 U.S.C. § 706 (1994); 28 U.S.C. § 1491(b)(4). The standard allows the court to set aside an agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

■■■ The plaintiffs must demonstrate that the agency's decision was without any rational or reasonable basis and that they were prejudiced as a result. *See Cubic Defense Sys.*, 45 Fed.Cl. at 457–58; *Synetics, Inc. v. United States*, 45 Fed.Cl. 1, 5 (1999). Under the arbitrary and capricious standard, the court is required to consider whether: (1) there was subjective bad faith on the part of procurement officials, (2) there was not a reasonable basis for the procurement decision, (3) the procuring officials abused their discretion, and (4) pertinent statutes or regulations were violated. *See Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 574, 492 F.2d 1200 (1974); *see also Metric Sys. Corp. v. United States*, 42 Fed.Cl. 306, 310 (1998). However, "there is no requirement or implication ... that each of the factors must be present in order to establish arbitrary and capricious action by the government." *See Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988). The APA requires a "thorough, probing, in-depth review" of the agency's action to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *See Citizens to Preserve Overton Park, Inc. v. Volpe,*

401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Nevertheless, contracting officials are granted wide discretion in their evaluation of bids and the application of procurement regulations. *See Synetics*, 45 Fed.Cl. at 5, *RADVA Corp. v. United States*, 17 Cl.Ct. 812, 818 (1989), *aff'd without op.*, 914 F.2d 271 (Fed.Cir.1990). *See also Ellsworth Assoc. Inc. v. United States*, 45 Fed.Cl. 388 at 392–93 (1999) ("With respect to an agency procurement decision that is argued to be irrational and unreasonable, the scope of review is very limited.") "The court ... should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983).

■■■ In addition, an agency decision will be set aside as arbitrary and capricious if the agency has not considered all relevant factors and articulated a rational connection between the facts found and the choice made. See *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *NKF Eng'g, Inc. v. United States*, 9 Cl.Ct. 585, 594 (1986), order vacated on other grounds, 805 F.2d 372, 378 (Fed.Cir.1986) (*citing Overton Park*, 401 U.S. at 416, 91 S.Ct. 814) ("[W]hat here condemns the contracting officer's decision, is that he failed to take into consideration critically important facts, all available to him at the time he made his decision and all of which cut the other way. A decision that fails to consider all relevant evidence is the essence of arbitrariness.")

■■■ Also, "to prevail in a bid protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Candle Corp. v. United States*, 40 Fed.Cl. 658, 665 (1998) (*quoting Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996)). To demonstrate prejudice "the protestor must show 'that there was a substantial chance it would have received the contract award but for the error.'" *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir. 1999) (*quoting Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996)).

### 1. NSF's Selection of Raytheon, Despite its Proposed Use of Iridium Was Not Arbitrary and Capricious and Does Not Lack a Rational Basis.

ASA and BR & S contend that NSF's selection of Raytheon was arbitrary and capricious because a bankrupt corporation was central to Raytheon's proposal and would be unavailable for Raytheon's use. This Court declines to make such a finding.

■ When technical matters are under review, courts must give greater deference to the Agency's decision. *See Cubic Defense Sys., Inc.*, 45 Fed.Cl. 450 at 457–58. Plaintiffs must do more than point out mere "mistakes" or "missteps;" they must "show that the claimed misstep was so excessive as to fall outside the decision-maker's ambit of discretion." *Id.* Plaintiffs have failed to do so in this case.

■ Plaintiffs allege that NSF became enamoured with Raytheon's Iridium solution. Plaintiffs have submitted numerous arguments in their briefs and submitted many exhibits to bolster their allegations. This Court has carefully reviewed all of this material and the entire record. There is a potential for some problems with Raytheon's Iridium solution. It does not follow, however, that NSF did not consider these potential problems and thus that the award was arbitrary and capricious or lacked a reasonable basis. On the contrary, the evidence shows that the nine experts on the TPEC deliberated for three days before deciding on the scores given to each of the offerors on the technical evaluation. The evidence also shows that the panel did, in fact, consider the potential weakness of Raytheon's solution. The panel also considered potential or actual weaknesses with both ASA's and BR & S's proposals. What is important in this case is that the panel was aware of all relevant factors, reviewed them, and reached a decision based upon their scientific and technical expertise that the solution offered by Raytheon was superior to that offered by any other offeror. This decision by the TPEC with regard to the technical evaluation scores was neither arbitrary, capricious nor without a rational basis.

### 2. NSF's Award Was Not a Clear Departure From the Announced Evaluation Scheme

■ Plaintiffs next argue that IT became the ultimate discriminator in the award decision, even though IT was not an announced evaluation factor or subfactor. FAR 15.304(d) requires an agency to state clearly in the solicitation all factors and significant subfactors that will affect the contract award and their relative importance. 48 C.F.R. § 15.304(d). NSF did not list IT/Communications as a factor in Section M of the RFP. NSF did list IT/Communications as an important aspect of the project in Section L of the RFP. Section L was designed to provide information to the offerors to assist them in preparing their proposal.

Both ASA and BR & S argue that IT/Communications played an extremely important role in the evaluation process and consequently, should have been listed as a factor in Section M and assigned an evaluation weight. The evidence belies this argument.

The *Concept of Operations* factor was weighted the heaviest of the technical factors evaluated by the TPEC. Section L indicated that in response to the *Concept of Operations* factors, each offeror should address the following four main categories, with significant subcategories: (a) logistics; (b) station and ship operations; (c) information technology (IT) and communications systems; and (d) facilities engineering and construction. RFP at § L7.

The TPEC panelists' notes and the final TPEC report clearly show that the committee considered all of the important categories under *Concept of Operations*, not just IT/Communications. Furthermore, IT/Communications is an overriding aspect of the USAP. The evaluators considered the IT/Communications proposals of all of the offerors as part of their decision under *Concept of Operations, Science Support* and *Model Projects*. In fact, the importance of IT is consistently mentioned throughout the RFP. It is not unreasonable for NSF to consider the IT solutions of all of the bidders at every stage in the evaluation process.

ASA and BR & S argue that they were unaware of the importance of the IT/Communications aspect of the proposal. The bidders were clearly on notice in the RFP that IT/Communications was a crucial part of the Project and that they needed to address it throughout their proposals. NSF questioned all of the offerors during the discussions about their approach to the various IT problems facing the Project. The fact that Raytheon offered a solution NSF considered superior to the solutions offered by ASA and BR & S does not clearly indicate that NSF elevated the status of IT/Communications to an evaluation factor. IT/Communications was a part of an integrated whole, and it was entirely appropriate for the TPEC to discriminate between the offerors on that basis.

### 3. The Post–BAFO Contacts Were Not Discussions.

■ Plaintiffs next argue that the contracting officer's communication with Raytheon after the final BAFOs were submitted constituted an improper post-BAFO discussion. Bill Bryant called Raytheon after the award decision was already made, but before the bidders were notified of the decision, to clarify some concerns NSF had regarding Iridium LLC. *See* e-mail from Jesse Lasken to William Bryant, Bart Bridwell and Robert Hardy, October 15, 1999, Pl's Ex. 10. In order to ensure that the capability would still be there, Bryant contacted Raytheon to request names of references whom he could call. *See* Bryant Depo. at 140 ("I was looking for names of individuals that I could better rely on, like U.S. contracting officers.") Bill Bryant did contact the individuals and determined that NSF should continue to regard Raytheon's proposed use of the Iridium system as a strength, despite the financial difficulties of Iridium LLC. *See* Memorandum to the File from Bill Bryant, 10/20/99, AR Binder 1, Item # 0001. There is no indication in the record that Bryant contacted Raytheon to discuss the technical merits of its proposal. No new information was solicited, and Raytheon was not given an opportunity to revise its proposal.

"Negotiations are exchanges, in either a competitive or sole source environment, between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal." FAR § 15–306(d). In this case, the evidence is clear that Bryant did not intend to allow Raytheon to revise its proposal. Accordingly, this communication was not a discussion and was not prejudicial to the plaintiffs.

### 4. The Potential Conflicts of Interest Were Adequately Dealt With by NSF.

■ Plaintiffs also argue that the award should be invalidated because of stock ownership of two members of the evaluation panel. [...] owned approximately $9,000 of Motorola stock. Memorandum for General Counsel, AR Binder 26a, Item # 0904. [...] apparently owned approximately $3,000 of Iridium stock, $7,000 of Motorola stock, and an undisclosed amount of Oracle stock. E-mail from Bart Bridwell to Charles Brown, NSF Ethics Advisor of 4/5/99, Hardy Depo. Exhibit # 15.

Government officials are prohibited from participating in a matter in which they have a financial interest unless they first "make[ ] full disclosure of the financial interest and receive[ ] in advance a written determination ... that the interest is not so substantial as to be deemed likely to affect the integrity of the services which the Government may expect from such officer or employee." 18 U.S.C. § 208.

Moreover, a financial interest must be one upon which the matter has a "direct and predictable effect." 5 C.F.R. § 2635.401. "Direct and predictable effect" means that there must be a "close causal link between any decision or action to be taken in the matter and any expected effect of the matter on the financial interest." 5 C.F.R. § 2635.402(b)(1)(i). Finally, de minimis stock ownership (defined as publicly traded securities valued at $5,000 or less) are exempted by regulation. 5 C.F.R. §§ 2635.402(d) and 2640.202.

In this case, [...] received a written waiver under 18 U.S.C. § 208. This waiver satisfies the requirements.

[...]'s ownership of Iridium stock falls within the de minimis exemption because it is

valued at less than $5,000. With regard to the Motorola stock, [. . .] consulted with Bart Bridwell who sent an e-mail to Charles Brown, NSF Ethics Advisor advising him of the conflict. *See* e-mail from Bart Bridwell to Charles Brown, 4/5/99, Hardy Depo. Ex. 15. Charles Brown responded by e-mail that:

> First, we can give him a waiver for Motorola, because the company is so big and his holding is so small.
>
> Second, he needs to find out how much his Oracle stock is worth, otherwishe (sic) I cannot consider a waiver (or maybe it's so small that the OGE exemption applies). Third, his holding in Iridium qualifies for the automatic OGE stock exemption ($5,000 or less); so it is not a problem unless or untill (sic) his holding groows (sic) mucch (sic) larger.

*Id.* Bridwell responded to Brown's concerns about [. . .]'s Oracle holdings by explaining that a waiver for Oracle stock was likely to be unnecessary since Raytheon was only proposing a use of licensed software. *Id.* This communication satisfies the requirements and intent of the statute.

### 5. NSF Did Not Engage in Disparate Treatment of the Offerors.

 ASA contends that NSF engaged in disparate treatment of the offerors. NSF allegedly was very concerned about the sale of the EG & G Technical Services to the Carlyle Group, but was indifferent to the bankruptcy of Iridium LLC, a critical element of Raytheon's technical proposal.

ASA did not provide sufficient evidence to the TPEC that ASA had a binding contractual relationship with the Carlyle Group or the Carlyle Group's newly created EG & G Technical Services, Inc., to ensure that EG & G Technical Services, Inc. would perform under the USAP contract. Although ASA promised that "the Carlyle Group will maintain all existing EG & G Technical Services contractual commitments," there was nothing in the record before NSF to show that it had obtained a guarantee of performance of the contract from either of the most critical entities—the business entity actually performing the work, the newly formed corporate entity EG & G Technical Services, Inc., or the party purchasing that unit, the Carlyle Group. Furthermore, NSF did not have evidence that ASA had the authority to represent or bind EG & G Technical Services, Inc. or the Carlyle Group. NSF was understandably concerned that the sale of one of the joint venture partners of ASA might result in potential contract problems.

The record is unclear regarding the sale and the potential effect the sale might have had on contract performance. Even though ASA alleges in its papers that "EG & G Technical Services was not altered by the sale to the Carlyle Group," and that "the staff, expertise, and capabilities of the company were unchanged," the response to NSF's questions did not so state. ASA PFF ¶ 96. It is true that ASA provided NSF with financial and performance guarantees. These guarantees, however, might reasonably have failed to allay NSF's concerns that ASA had lost the innovative technical part of its joint venture. This concern is certainly echoed by the TPEC in its comments made regarding the sale. See Facts Section, above at page 7.

Furthermore, the relationship between ASA and EG & G is not similar to the relationship between Raytheon and Iridium LLC. EG & G was a joint venture partner of ASA, while Iridium was a potential vendor to Raytheon. Thus, it was not irrational for NSF to treat the two relationships differently.

BR & S contends that NSF treated it irrationally when it persisted in designating as a weakness BR & S's use of [. . .] as a subcontractor even after BR & S allegedly removed [. . .] from its proposal. After a careful consideration of the documents cited by BR & S to support its contention that it removed [. . .] from its proposal, this Court finds that it was not irrational for NSF to believe that BR & S did not, in fact, remove [. . .] from its proposal.

In response to a BAFO question regarding [. . .], BR & S replied:

> While our commitment to [. . .] remains high, the firm has been unable to provide rates that can be verified by the DCAA.

BR & S routinely performs this work internally, and therefore has elected to staff these positions internally and our cost proposal has been revised to reflect this action. No subcontract for this portion of the work will be issued to [ . . . ], or any other subcontractor, without the following:

- NSF contracting officer approval
- Verification of all rates to the satisfaction of NSF.

Further, BR & S assumes the cost risk for this portion of the work and guarantees to the NSF that should these scopes of work be subcontracted, the costs will not exceed those which would have been incurred had the work remained in-house.

AR Binder 54, Item # 2370.

The Court interprets this language differently than BR & S. At best, the answer to the question is ambiguous. It was not irrational for NSF to interpret the answer to the BAFO question to mean that BR & S was still committed to [ . . . ] and would likely present it as a subcontractor had BR & S been awarded the contract. Bart Bridwell testified that he did not recall anyone from BR & S telling him that they were going to remove [ . . . ] from their proposal. *See* Bridwell Depo. at 124. He testified further that he still believed "that [ . . . ] was a member of the BR & S team, because there was no subsequent revision to the Volume 2, the Technical Proposal removing them from the [ ] team. There was no revision to Volume 3, the Past Performance Proposal, that would delete the information supplied earlier." *Id.* at 128. The record does not support BR & S's contention that it unambiguously removed [ . . . ] from its proposal.

### 6. The Cost Evaluation Was Not Unreasonable.

Plaintiffs finally argue that NSF should have evaluated the cost of Raytheon's proposed Iridium solution. The RFP indicates to the bidders that the costs of satellite communications would be normalized, *i.e.*, a set figure was provided by NSF for all bidders to use, because actual cost could not be determined. *See* AR Binders 13–14. This was not unreasonable. *See Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 345, 359 (1997) (holding that it was not unreasonable for the source selection official to normalize costs where the solicitation warned bidders of cost normalization). Plaintiffs cannot now argue that NSF's actions were unreasonable.

The Court has considered all of the other arguments advanced by plaintiffs and find them without merit.

### CONCLUSION

ASA and Raytheon received extremely close scores from the technical evaluation panel. This was clearly a close competition involving a number of competent contractors. In the end, NSF determined which contractor it thought would provide the greatest value to the government. This was an extremely difficult decision. The method of evaluation called upon the technical knowledge and expertise of many panelists. This Court will not second-guess this complicated and difficult process. Plaintiffs have not shown that NSF's decision to award the contract to Raytheon was arbitrary and capricious or without a rational basis. This Court refuses to set aside the award.

For the foregoing reasons, plaintiff ASA's motion for summary judgment and plaintiff BR & S's motion for summary judgment are denied, and defendant's cross-motion for summary judgment and defendant-intervenor's cross-motion for summary judgment are granted. The Clerk will dismiss the complaints filed by ASA and BR & S and will enter judgment for the defendant. No costs.

