**GREAT LAKES DREDGE & DOCK COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 03–1891 C.**

United States Court of Federal Claims.

Filed under seal April 13, 2004.

Reissued April 20, 2004.[1]

1. This opinion was originally filed under seal on April 13, 2004, pursuant to this Court's October 20, 2003 protective order. The parties were given an opportunity to advise the Court of their views with respect to any "protected information" referred to in the opinion that they asserted was required to be redacted under the terms of the protective order. The parties jointly requested certain redactions. The Court agreed with some of the parties' initial proposed redactions, but not others. At the Court's request, the parties submitted revised proposed redactions. The Court agreed with the revised proposed redactions and redacted the materials requested by the parties. The Court's redactions are indicated by asterisks in brackets ([* * *]). The Court has also, in this reissued opinion, corrected errata.

Daniel C. Sauls, Steptoe & Johnson, Washington, D.C. for plaintiff. Douglas L. Hilleboe, Steptoe & Johnson, Washington, D.C., of counsel.

James M. Meister, Trial Attorney, Robert E. Kirschman, Jr., Assistant Director, David M. Cohen, Director, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. James R. Thornton, Jr., Principal Assistant District Counsel, Savannah District, United States Army Corps of Engineers, of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

Plaintiff, Great Lakes Dredge & Dock Company ("GLDD"), filed this bid protest action on August 11, 2003, alleging that the United States Army Corps of Engineers ("Corps") improperly cancelled Solicitation No. DACW21–02–B–0005.[2] Prior to reassignment of this case,[3] on November 17, 2003, defendant, United States ("Government"), filed a motion for judgment on the administrative record. Plaintiff responded on December 17, 2003 by filing a cross-motion for judgment on the administrative record. Oral argument was held on March 16, 2004. For the following reasons, defendant's motion for judgment on the administrative record is DENIED and plaintiff's motion for judgment on the administrative record is GRANTED.

### I. Background

#### A. The Solicitation and Cancellation

The Corps issued solicitation number DACW21–02–B–0005 ("IFB" or "Solicitation") on July 17, 2002.[4] The IFB set forth plans and specifications for deepening the Brunswick Inner Harbor in Brunswick Harbor, Georgia.[5] The IFB is part of a larger project to deepen the ship channel into Brunswick Harbor.[6] A separate dredging contract for deepening the outer seaward

---

2. Def.'s Mot. for SJ at 2.

3. This case was reassigned from Judge Sypolt to Judge G. Miller on January 29, 2004.

4. Pl.'s Counter–Statement of Facts ¶ 1.

5. *Id.*

6. Pl.'s Cross–Mot. at 1.

section of the Brunswick Entrance Channel has been awarded, and dredging under that contract has commenced.[7] The IFB covers the inner portion of the project.[8] Administrative Record ("AR" or "record") Tab 50 at 1068–69. The purpose of the overall project is to provide a deeper and wider channel to accommodate larger vessels, reduce operating costs of shippers, and provide a safer environment for navigation. AR Tab 51 at 1124–25. These goals cannot be achieved unless both the outer and inner portions of the harbor are deepened by dredging.[9]

The Corps designed the Inner Harbor portion of the project so that it could be performed by a rock-cutting hydraulic dredge. AR Tab 2 at 2; Tab 50 at 1096. During the design process, the Corps concluded that sufficient hydraulic dredges would be available that were capable of removing the material without blasting and that mechanical dredges would not be competitive with hydraulic dredges. AR Tab 2 at 2; Tab 50 at 1096. Because the contract contemplated hydraulic dredges and not mechanical dredges, and because the Corps lacked the necessary permits, the IFB did not provide for an open water disposal site.[10] *Id.*; AR Tab 50 at 1080–81.

When the IFB was issued, in July 2002, it included section 02325, entitled "Dredging." AR Tab 5 at 274–94. Paragraphs 5.2 and 5.3 of Section 02325 addressed the character of the materials to be dredged under the IFB. AR Tab 5 at 279–81. In addition to more than two pages of single-spaced text describing the materials, paragraph 5.3 referred bidders to two appendices provided with the IFB: Appendix A (Boring Logs), which contained logs of 198 borings relating to the material to be dredged and Appendix B (Laboratory Data), which provided results of over 600 lab test results, including 43 unconfined compressive strength tests results relating to the strength of the rock to be dredged. AR Tab 5 at 280.

In addition to the soils information provided in the IFB, on August 6 and 7, 2002, the Corps made available for inspection 66 core samples of the materials to be dredged in the Inner Harbor project area and conducted a test excavation at two of the areas to be dredged under the IFB. AR Tab 11 at 364. Representatives of GLDD, Weeks Marine, Inc. ("Weeks"), Bean Stuyvesant LLC ("Bean Stuyvesant"), and Norfolk Dredging ("Norfolk") attended the core inspection and the test dig. *Id.* The core samples were laid out for all prospective bidders to observe and analyze. *Id.* at 364, 373–80. At the August 6 core display, Mr. Matt Delano, the Project Geologist for the Corps, fielded questions from, and discussed the core samples with, those in attendance. *Id.* at 364–67. According to Mr. Delano's report, the attendees were interested in seeing "the material described in the specifications that had the unconfined compressive strength result of 8,100 psi." *Id.* at 365. Mr. Delano responded that there were no cores of the specific material and that none of the cores tested that high. AR Tab 11 at 365. He further explained to the bidders that "it should still be anticipated that material testing that high or higher might be collected from disposed material." *Id.*

The attendees also asked to see "material that may be similar to the 19,000 psi [unconfined compressive strength] rock that was encountered at Kings Bay as was referenced in the specifications." *Id.* The reference to Kings Bay rock was found in the original solicitation at Paragraph 5.3.3, which stated, in pertinent part:

> Unconfined compressive strength analyses have been performed on a number of core samples and dredge spoil samples from within the project area. Results of completed tests range from a low of 90 pounds per square inch (psi) to a high of 8,100 psi. Strength analyses for samples collected in similar rock at nearby Kings Bay, Georgia yielded results as high as 19,395 psi.

7. Def.'s Statement of Facts ¶ 2; Pl.'s Counter–Statement of Facts ¶ 2.

8. *Id.*

9. Pl.'s Counter–Statement of Facts ¶ 2.

10. Contractors using mechanical dredges would need an open water disposal site. An open water disposal site is not necessary for contractors using hydraulic dredges. AR Tab 50 at 1080.

Though the rocks at Brunswick Harbor did not test that high, it should be anticipated that some will exceed the 8,100–psi value and may approach the higher 19,395 result obtained at Kings Bay.

AR Tab 5 at 281. Mr. Delano explained that no such material had been encountered in the Brunswick Inner Harbor and that the reference was included in the solicitation to inform prospective bidders as to what type of materials had been successfully removed on other projects along the coast and what type of equipment had been used to remove it. AR Tab 11 at 365. A representative from Norfolk told Mr. Delano that, other than the area to be dredged in the South Brunswick River, he did not feel that his company had equipment that could dredge the project. AR Tab 11 at 365.

On August 7, the attendees went with Mr. Delano out onto the Brunswick River for two test digs so that they could observe first-hand the materials to be dredged. *Id.* at 366, 382–92. There, a discussion of the solicitation's references to the Kings Bay rock again ensued. *Id.* at 367. Mr. Delano again explained that bidders "should anticipate encountering rock that could test harder than the 8,100–psi specimen." *Id.* Mr. Delano's report indicated that the GLDD representative, Mr. Sraders, responded that this information was "exculpatory." *Id.*

In response to the discussions at the core display, GLDD sent a letter dated August 14, 2002, in which it objected to the two sentences contained in paragraph 5.3.3 of section 02325 that referred to rock found at a different location (Kings Bay) that was stronger than any of the rock represented by the IFB to be present at the Brunswick site. AR Tab 44 at 1050–55. In its August 14 letter, GLDD stated that the representations in Paragraph 5.3.3 of the solicitation that rock strengths will likely exceed 8,100 psi and could approach 19,935 psi, were an improper attempt by the Corps to undermine the actual test data regarding core samples that was set forth in Appendices A and B to the initial solicitation.[11] *Id.* at 1051. GLDD alleged

that this language in Paragraph 5.3.3 was an attempt by the Corps to exculpate itself from a future claim under the contract's Differing Site Conditions clause [12] if the materials encountered while dredging in fact turned out to exceed 8,100 psi or approached 19,935 psi. *Id.* at 1051–54. GLDD continued, "[T]he uncertainties created by the reference to rock from a different channel invite and virtually compel offerors to include significant contingencies in their bids" and "the government benefits when it deletes IFB language that creates the need for contingencies by obtaining a lower price and only paying for contingent risks if they actually occur." *Id.* at 1054–55. GLDD requested that "the Corps promptly issue a modification to the IFB that removes the two sentences in paragraph 5.3.3 that refer to rock at Kings Bay, Georgia." AR Tab 44 at 1055.

GLDD's August 14 letter additionally raised the issue of whether pre-treatment of the rock was permitted under the terms of the solicitation:

> The Kings Bay rock referred to is significantly stronger than any rock in Appendices A and B and is not practically and economically dredgeable without pre-treatment such as drilling and blasting. Yet because the IFB contains no provision regarding drilling and blasting, we interpret it to prohibit drilling and blasting on this project.

*Id.* at 1051.

> If the Corps continues to advise the contractor to anticipate rock with strengths of 19,395 psi, a rock that is not practically and economically dredgeable by mechanical or cutter suction dredge, will pre-treatment be allowed? Will the Corps provide additional information about the quantity, location and elevation of such rocks so that offerors can prepare realistic bids?

AR Tab 44 at 1056.

On August 15, 2002, Bean Stuyvesant submitted a written question in which it requested that the order of work be changed so that the sections that contain the rock formations

---

11. Def.'s Statement of Facts ¶ 31.

12. The IFB contained the Differing Site Conditions clause found at 48 C.F.R. § 52.236–2 (1984).

could be dredged during the last portion of the project. AR Tab 45 at 1060. The Corps responded, refusing to permit a contractor to first remove the sand materials and then later return to remove the rock materials, instead requiring a strict order of performance. AR Tab 13 at 401.

On August 16, 2002, GLDD sent another letter to the Corps, with further questions about the information provided in the solicitation regarding rock and material strengths. AR Tab 46. Referring to the statements in Paragraph 5.3.3, GLDD requested more information about the "unconfined compressive strength" of the rock "in order to properly evaluate the dredgeability of the rock identified in the borings." *Id.* at 1061. GLDD also requested more information on the materials to be dredged located in the "East River or Turtle River" sections of the Project. *Id.* at 1062.

In response to the various items of correspondence from GLDD, on September 26, 2002, the Corps issued Amendment 0006 to the solicitation. AR Tab 13. The amendment deleted the reference to the rock at Kings Bay, Georgia. *Id.* at 399. Thereafter, the IFB did not refer to any rock having an unconfined compressive strength greater than 8,100 psi. Amendment 0006 also expressly advised bidders that blasting would not be allowed under the IFB. This amendment revised paragraph 1.1.2 of section 02325 to state:

> At this time, no blasting is allowed during this contract. The Government has not and will not obtain environmental approvals for blasting in Brunswick Harbor. The process to obtain permits and approval for blasting would be a lengthy process (with no assurance that approval will be given at the end of the coordination effort).... Due to the year round presence of manatees and other factors, it may not be possible to obtain approval for blasting.

AR Tab 13 at 429.

Amendment 0006 also addressed GLDD's request for more unconfined compressive strength information:

> A list of 19 samples was provided as a suggestion for additional testing. The Government's material testing specialist

determined some of the pieces were too desiccated to be tested, or were cracked and too short. Ten pieces were selected and tested in accordance with ASTM D2938. The results of these samples ranged from 90 pounds a square inch (psi) to 4,300 psi. A copy of this data is attached and has been provided in Appendix B of the [plans and specifications]. Furthermore, the data has been incorporated into the amended [plans and specifications] character of materials paragraph. The UCS data provided in the original [plans and specifications] ranges from 90 psi to 8,100 psi. These additional results are consistent with the data provided in the original [plans and specifications] and should be used in conjunction with the existing data.

> Although additional test data is being provided, results show UCS results within the range of the previous tests. Bidders should factor these results into their bid. However, bids should be based on consideration of all geotechnical data provided; including that made available during the core display and test dig, all geotechnical information in the more than 150 boring logs, and all unconfined compressive strength data.

AR Tab 13 at 401. In Amendment 0006, the Corps also provided bidders with ten more unconfined compressive strength test results for the 10 of 19 samples that were testable. *Id.* at 457.

On October 1, 2002, GLDD sent another letter to the Corps, requesting that the Corps explain the significant variance in unconfined compressive strength test results for material identified as coming from the same sample in test data previously supplied by the Corps. AR Tab 47 at 1065. On October 4, 2002, the Corps issued Amendment 0007, stating:

> The different test results reflect separate core samples collected from the same specimen. The results for one set of specimen cores were reported in the earlier report, while the results of the second set of specimen cores were reported in the later report. Photographs showing some of the

multiple-core samples are provided in the "Petrographic Analyses" portion of Appendix B.

In accordance with Paragraph 5.3.1 and 5.3.3 of the plans and specifications, Character of Materials, variations in rock characteristics beyond each boring location are to be expected. The differences in the strengths of these specimens over such short differences are often due to differences in core orientation and preparation, voids, partings, depth within rock sequence, moisture content, and similar in situ characteristics of the rock.

AR Tab 14 at 459. GLDD was satisfied with the Corps' response.[13]

The Corps extended the date for the bid opening six times, from August 20, 2002 to October 17, 2002. AR Tabs 9, 10, 12, 13, 14, 15. On October 15, 2002, the Contracting Officer denied a request for a two-week extension of the bid opening date made by Bean Stuyvesant because:

[T]he project solicitation is adequate as it now stands and is considered biddable. There is also a need to move forward on this project as there have already been numerous bid opening date extensions, which we believe have been thoroughly addressed resulting in a sound solicitation document.

AR Tab 17 at 471.

The Corps opened bids under the IFB on October 17, 2002. Three bids were submitted: GLDD ($65,893,464); Bean Stuyvesant ($91,689,020); and Weeks ($123,814,750). AR Tabs 18, 19, 20. Each of the bidders identified a rock cutting hydraulic dredge capable of performing the work in its bid. *See* AR Tab 18 at 494 (GLDD, dredge Illinois), Tab 19 at 505 (Weeks, dredge R.S. Weeks); Tab 20 at 544 (Bean Stuyvesant, dredge Meridian). The three bidders are the three largest dredging companies in the United States, and they have performed virtually all rock dredging in the United States for the past 25 years.[14]

The Original Government Estimate ("Original GE") for the Inner Harbor work was only $28,433,350. AR Tab 8 at 349. A federal statute, 33 U.S.C. § 624(a) (2000), prohibits the Corps from awarding a dredging contract for an amount more than 25% greater than a fair and reasonable estimate of a well-equipped contractor's cost of performing the work. Because the lowest bid, GLDD's $65,893,464, was more than 100% greater than the Original GE, the Corps was unable to award the contract. *See* 33 U.S.C. § 624(a). Accordingly, on the day after bid opening (October 18, 2002) GLDD filed an agency bid protest challenging the reasonableness of the Original GE. AR Tab 21 at 559–60. GLDD asserted that the Original GE was unreasonably low and that, if the Original GE were corrected to reflect a fair and reasonable estimated cost of a well-equipped contractor, GLDD's bid would be well within the awardable range. *Id.* GLDD also stated that it was prepared to meet with the Corps to discuss this issue. *Id.*

Also on the day of bid opening, the Corps' Project Manager suggested that the bid prices received under the IFB be checked against "comparable work in other East Coast Districts" to see if the bid prices were reasonable. AR Tab 50 at 1068. The Corps never made such comparison.[15] Instead, the Corps asked members of the East Coast Dredge Team ("ECDT") to conduct an independent review of the Original GE. AR Tab 50 at 1075. By November 7, 2002, the ECDT had completed its initial review of the Original GE, and the ECDT's preliminary, independent dredging cost estimate was within 1.2% of the Original GE. AR Tab 50 at 1084–85.

On November 14 and 15, 2003, the Project manager met with the ECDT to discuss the ECDT's review. In addition to conducting a review of the Original GE, the ECDT made several "findings" as to why, in its opinion, the bids were "high." *Id.* at 1080. The Project Manager summarized the ECDT's findings in a November 17 e-mail to the project team. The findings included:

---

**13.** *See* Pl.'s Response to Def.'s Statement of Facts ¶ 37.

**14.** Pl.'s Cross–Mot. at 4.

**15.** *Id.* at 5.

1) The ECDT estimate was within 1% of the Original GE;

2) The Corps had provided sufficient geotechnical information in the IFB for contractors to bid the job;

3) Some of the wording in the geotechnical specs and inclusion of Kings Bay Unconfined Compressive Strength test figures (19,000 psi) may have given the contractors cause to be overly concerned with respect to the dredgeability of the rock;

4) The IFB's prohibition of blasting was "one of the large factors contributing to the high bid costs" and "limited the competitive field to one bidder (GLDD) because GLDD is the only outfit that can truly dig this type of rock . . . ."

5) The Order of Work did not allow for the contractor to move beyond an acceptance section until clearing the one being worked on. This would preclude the contractor from moving on to another section while hard, non-dredgeable rock is either blasted or punched for mechanical removal;

6) There was no alternate open water disposal for large chunks of rock (critical for the mechanical dredge firms).

AR Tab 50 at 1080.

On November 17, the Corps' Project Manager informed the project team via e-mail that a meeting had been set up with GLDD regarding GLDD's protest. The e-mail informed the project team: "It is clear that we will not be able to justify an award to Great Lakes, but we must move through with the protest resolution . . . ." *Id.* On November 22, 2002, GLDD officials went to Savannah and made a presentation to members of the Project Delivery Team and the East Coast Dredging Team members regarding the Project and GLDD's bid. AR Tabs 24–25 and Tab 50 at 1080–81. GLDD's PowerPoint presentation included an analysis of the bid results, an assessment of rock dredging and methodology, and a review of GLDD's dredging equipment and the costs of operating the equipment.[16] *See* AR Tab 25. Also as part of this presentation, GLDD identified industry rock cutting hydraulic dredges that are capable of performing the dredging required under the IFB, including Bean Stuyvesant's dredge Meridian and Weeks' dredge R.S. Week.[17] GLDD also presented an estimate of the cost for a standard industry rock cutting hydraulic dredge to perform the work required under the IFB. This estimate of $87 million exceeded GLDD's $65.9 million bid price.[18]

At the November 22 meeting, GLDD explained why its bid price was lower than the standard dredge cost.[19] GLDD stated that the gap between its bid price and those of its competitors was due to GLDD's superior equipment for rock dredging and was based on GLDD's plan to perform the sections of the work containing the strongest rock with the dredge Texas, which is the most powerful and efficient rock-cutting hydraulic dredge in the industry.[20] AR Tab 25.[* * *].

During the presentation, the Contracting Officer, Ms. Williams, took notes as to what GLDD said. AR Tab 25 at 565–67. The notes are sparse and somewhat cryptic, but they are the only notes that remain, and the only evidence in the administrative record as to what was said at the November 22 meeting. According to Ms. Williams' notes, GLDD expected that 25 percent of the material to be dredged would be rock and that this rock would be found only in 50 percent of the area to be dredged. *Id.* at 565. Also according to Ms. Williams' notes, GLDD stated that it intended to use two of its hydraulic cutter-suction dredges-one named the Illinois and another, more powerful dredge-the most powerful dredge in the United States-named the Texas. *Id.* at 565. Ms. Williams noted that GLDD "believe[d] there is rock there that the Illinois cannot dig." *Id.* On the next page, Ms. Williams noted "Texas–Only one." *Id.* at 566. Finally, Ms. Williams noted that "No blasting seems to be big issue" because, although "[b]lasting doesn't mean cheaper,"

16.  Def.'s Statement of Facts ¶ 39.

17.  Pl.'s Response to Def.'s Statement of Facts ¶ 39; Pl.'s Counter–Statement of Facts ¶¶ 26–27.

18.  Def.'s Statement of Facts ¶ 13.

19.  Pl.'s Counter–Statement of Facts ¶ 27.

20.  *Id.;* Def.'s Statement of Facts ¶ 40.

it means "you can get it done." AR Tab 25 at 566–67.

On November 26, 2002, the Corps asked GLDD to withdraw its protest challenging the reasonableness of the Original GE. AR Tab 28 at 0570. GLDD declined to withdraw the protest and asked the Corps, pursuant to the Corps' regulations (Engineering Federal Acquisition Regulation Supplement or "EFARS"), to provide GLDD with the Original GE and all back-up data. AR Tab 26 at 568. EFARS § 33.103–100 instructs the Corps how to handle a protest of the reasonableness of the government estimate. It states:

> If an apparent low bidder protests the reasonableness of the Government estimate, the Command shall provide the details of the Government estimate to the protestor upon receipt of the complete details of the protestor's estimate.

AR Tab 31 at 605.

GLDD provided the Corps with the complete details of GLDD's as-bid estimate on December 4, 2002. AR Tab 30 at 574–604. The Corps did not provide any information regarding the Original GE. AR Tab 31 at 605; Tab 33 at 608. Prior to December 24, 2002, GLDD requested, four times in writing, that the Corps produce the details of the Original GE to GLDD. AR Tabs 26, 30, 31, 33. In violation of its own regulations, the Corps did not provide any details of the Original GE to GLDD prior to December 24, 2002. AR Tab 37 at 615.

On December 24, 2002, the Corps issued Amendment 0009, cancelling the IFB and issued a document entitled "Determination and Findings Authority to Cancel IFB" ("December 24 Memorandum"). AR Tabs 1 and 2. The December 24 Memorandum identified three bases for cancelling the IFB:

> 1) Award to GLDD based on GLDD's apparent low bid would exceed the maximum total project cost limit;
> 2) All bids received were at unreasonable prices compared to the Original GE;
> 3) The IFB contained inadequate specifications.

AR Tab 2 at 2–3. The Contracting Officer noted the ECDT's findings that the solicitation should have permitted blasting as an alternative method for loosening and removing rock materials and should have also permitted an alternative open-water disposal site for dredged materials. AR Tab 2 at 2. This in turn would have permitted firms with mechanical and other types of dredging equipment to bid on the job. *Id.* The Contracting Officer noted the presentation made by GLDD on November 22, 2002 and made the following conclusions:

> [GLDD] summarized its position stating that the government estimate did not account for wear and tear on dredge equipment or reduced production resulting from the "possibility" of high compressive strength rock. GLD & D stated it had the only hydraulic dredge in the industry capable of efficiently dredging the rock, the "Texas," and even with that dredge the production drops off significantly at rock strengths higher than 3000 or 4000 psi. From the presentation, it was clear that the lack of blasting in the specifications excluded firms with mechanical equipment and increased risk of not successfully completing the job.

> In short, the inability to blast, the unknowns surrounding the hardness of the rock to be dredged, and the quantities and locations of the rock not only caused bidders to increase their bids to incorporate higher risk, but also eliminated competition within whole sections of the industry. Competition was further restricted since the specifications did not provide for an open water disposal site making it too costly for plants other than hydraulic dredges to compete. Unintentionally, the specifications essentially sole-sourced the one hydraulic dredge capable of dredging harder material efficiently. FAR 14.404–1(c)(1) provides that the Solicitation may be cancelled upon a finding that the specifications are inadequate.

AR Tab 2 at 2–3.

### B. Chronology of Events Subsequent to Cancellation of the Solicitation

Shortly after December 24, 2002, the Corps submitted a Post Authorization Change Report (dated January 2003) seeking

to increase the authorized project cost from $50,717,000 to $78,879,000 and to increase the maximum total project cost limit from $69,301,000 to $99,782,000. AR Tab 51 at 1100. These increases were authorized by Congress, resolving the funding issue raised in the December 24, 2002 Memorandum.[21]

After December 24, 2002, the Corps, for the first time, provided GLDD with significant details regarding the Original GE. AR Tabs 37–40. After a meeting between GLDD and the Corps and exchanges of additional information, the Corps determined that the cost data used in both the Original GE and in the ECDT's initial review of the Original GE were understated, rendering the Original GE inaccurate.[22] Therefore, the Corps issued a Revised Government Estimate ("Revised GE") in the amount of $53,624,345.[23] This estimate reflects an increase of more than $25 million and more than 88.7% compared to the Original GE of $28,433,350. AR Tab 8 at 349. As a result of the Revised GE, a contract may be awarded to GLDD consistent with 33 U.S.C. § 624 because GLDD's bid is within 25% of the Revised GE.[24]

Subsequently, GLDD filed its complaint in this bid protest action, challenging the cancellation of the solicitation and arguing that its low bid should be accepted as responsive to the solicitation. Because of the post-cancellation activity discussed above, the Government, in attempting to justify cancellation of the IFB, relies solely on the argument that the specifications were inadequate, and has abandoned the two other bases for cancellation stated in the December 24 Memorandum.

## II. Discussion

### A. Jurisdiction and Standard of Review for Bid Protests

The Court has jurisdiction over this bid protest action pursuant to 28 U.S.C. § 1491(b) (2000). Section 1491(b)(4) explicitly provides that in any action under § 1491(b), "The courts shall review the agency's decision pursuant to the standard set forth in section 706 of title 5," the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (2000). Section 706(2) provides that the reviewing court shall: "Hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...or (D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A) (2000); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

The Supreme Court has held that in reviewing agency action, the court must consider whether the agency's decision was based on a consideration of all the relevant factors and whether there has been a clear error of judgment. *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814. An agency decision will be set aside as arbitrary and capricious if the agency has not considered all relevant factors and articulated a rational connection between the facts found and the choice made. *Antarctic Support Assoc. v. United States*, 46 Fed.Cl. 145, 154 (2000) (citing *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). While the agency's decision is entitled to "a presumption of regularity," that presumption does not shield the agency's decision from a "thorough, probing, in-depth review." *Overton Park*, 401 U.S. at 415, 91 S.Ct. 814. After-the-fact rationalizations for agency action should be rejected, and legal arguments for agency actions must find support in the administrative record. *See id.* at 419, 91 S.Ct. 814. And although the arbitrary and capricious standard is highly deferential, "it is not a rubber stamp." *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 742 (2000). "It especially does not

---

21. Def.'s Statement of Facts ¶¶ 53–54; Def.'s Mot. at 17 n. 10.

22. Pl.'s Mot. at 9 (citing Def.'s Statement of Facts ¶ 56). Specifically, the Savannah District ultimately learned that its IGE was inaccurate because the historical data upon which it was based were no longer accurate. Def.'s Mot. at 16.

23. Def.'s Statement of Facts ¶¶ 55–58.

24. Def.'s Mot. at 17 n. 10.

require this court to accept, in a Kierkegaardian leap of faith, bald assertions on a critical point that are not otherwise tied to the administrative record and that are at least in tension with, if not contradicted by, various aspects of that record." *Id.* Only by "carefully reviewing the record and satisfying [itself] that the agency has made a reasoned decision" can this court "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *Id.* (quoting *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). The court, however, cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. *Seaborn Health Care, Inc. v. United States,* 55 Fed.Cl. 520, 523 (2003); *CRC Marine Servs., Inc. v. United States,* 41 Fed.Cl. 66, 83 (1998).

## B. Standard of Review for Judgment on the Administrative Record

■ From a procedural standpoint, bid protest actions are considered upon cross motions for judgment on the administrative record pursuant to RCFC 56.1. *See WorldTravelService v. United States,* 49 Fed.Cl. 431, 438 (2001). The standards applicable to a motion for judgment on the administrative record differ from a RCFC 56 motion for summary judgment. *See Lion Raisins, Inc. v. United States,* 51 Fed.Cl. 238, 246–47 (2001); *Tech Systems, Inc. v. United States,* 50 Fed.Cl. 216, 222 (2001). The statements and counter-statements of facts prepared pursuant to RCFC 56.1 argue the significance and weight accorded to the facts that were the basis for the agency decision. *Tech Systems,* 50 Fed.Cl. at 222. The inquiry in a review of the administrative record in a bid protest is whether, given all the disputed and undisputed facts, a protester has met its burden of proof that an award is arbitrary, capricious . . . or violates to prejudicial effect an applicable procurement regulation. *Id.*

(citing *CCL Serv. Corp. v. United States,* 48 Fed.Cl. 113, 119 (2000)).

■ Under this standard, it is well settled that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). That record consists of the materials and files that were before the agency at the time the decision was made. *See Florida Power & Light v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985); *Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.,* 423 U.S. 326, 331, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976). The administrative record should not include materials created or obtained subsequent to the time the decision-maker decided to take the challenged agency action or materials adduced through discovery by opponents of the agency's actions in *de novo* proceedings in court. *See id.*

## C. Standard Governing Cancellation of an Invitation For Bids after Bid Opening

The Federal Acquisition Regulation provides rules for cancellation of an invitation for bids ("IFB") after opening. *See* 48 C.F.R. § 14.404–1 ("FAR 14.404–1"). Paragraph (a)(1) provides that the "[p]reservation of the integrity of the competitive bid system dictates that, after bids have been opened, award must be made to that responsible bidder who submitted the lowest responsive bid, unless there is a compelling reason to reject all bids and cancel the invitation." *Id.* A compelling reason exists, such that invitations may be cancelled and all bids rejected before award but after opening, when "the agency head determines in writing that inadequate or ambiguous specifications were cited in the invitation," FAR § 14.404–1(c)(1), or "for other reasons, cancellation is clearly in the public interest," FAR § 14.404–1(c)(10).[25]

---

25. FAR § 14.404–1(c)(1)(6) allows for cancellation when "all otherwise acceptable bids received are at unreasonable prices." The Government, in its motion for judgment on the administrative record, relied upon this provision as support for the decision to cancel the solicitation. Def. Mot. at 20. Based on the text of the Government's briefs, as well as oral argument, however, the Government no longer relies on this provision because subsequent to cancellation, the Corps revised its Original GE, and GLDD's bid was reasonable as compared

The Claims Court explained why FAR § 14.404–1 restricts administrative authority to cancel an IFB after bid opening:

> The rejection of all bids after they have been opened tends to discourage competition because it results in making all bids public without award, which is contrary to the interest of the low bidder, and because rejection of all bids means that the bidders have expended manpower and money in the preparation of their bids without the possibility of acceptance.

*Vanguard Security Inc. v. United States,* 20 Cl.Ct. 90, 102 (1990) (citing *P. Francini & Co., Inc. v. United States,* 2 Cl.Ct. 7, 9 (1983)). In this respect, the court has recognized that after bid opening, bids "have been exposed to their competitors and will constitute 'sitting ducks' to serve as targets for competitors in the next round of bidding. Certainly, such a situation tends to undermine the integrity of the bidding process [that FAR § 14.404–1] is designed to foster and protect." *California Marine Cleaning, Inc. v. United States,* 42 Fed.Cl. 281, 292 (1998) (quoting *P. Francini,* 2 Cl.Ct. at 10). For this reason, the Court of Claims recognized more than fifty years ago, and this court recognizes today, that "[t]o have a set of bids discarded after they are opened and each bidder has learned his competitor's price is a serious matter, and it should not be permitted except for cogent reasons." *Massman Constr. Co. v. United States,* 102 Ct.Cl. 699, 719, 60 F.Supp. 635, 643 (1945); *California Marine,* 42 Fed.Cl. at 292 (stating that the contracting officer's generally broad discretion to cancel a solicitation is thus substantially narrowed after bid opening to prevent harm to the integrity of the bidding system).

This court and other courts have upheld protests challenging unlawful cancellations where the Government has not established a compelling reason to cancel a solicitation after bids have been opened. *See, e.g., Overstreet Elec.,* 47 Fed.Cl. 728 (setting aside cancellation based on unreasonable prices where government estimate was unreasonably low); *California Marine,* 42 Fed.Cl. at 294; *Ace–Federal Reporters, Inc. v. FERC,* 734 F.Supp. 20 (D.D.C.1990). The Claims Court has held that "as a general proposition, it is our view that cancellation after bids are opened is inappropriate when an otherwise proper award under a solicitation would serve the actual needs of the Government." *Vanguard Security,* 20 Cl.Ct. at 102 (quoting *P. Francini,* 2 Cl.Ct. at 9). That view has been adopted by the Court of Federal Claims. *See, e.g., California Marine,* 42 Fed.Cl. at 292.

Although FAR § 14.404–1(c)(i) recognizes that inadequate or ambiguous specifications may be a compelling reason for cancellation, the Government's assertion that the specifications are inadequate, without more, is insufficient. Where the Government has failed to consider all relevant factors and its reasons for cancellation are not supported by the record, no compelling reason exists. *See, e.g., Vanguard Security,* 20 Cl.Ct. at 105–06, 107 (The principal motivation for cancellation of the solicitation, *i.e.,* that the solicitation did not allow the agency to obtain additional services on an immediate basis, "lacks a rational basis both in law and in fact and cannot be upheld as a permissible exercise of the agency's discretion."); *id.* at 107 (decision to cancel based on alleged confusion of bidders "is without any factual predicate in the record that could justify the determination as reasonable"); *Ace–Federal Reporters,* 734 F.Supp. at 26 (reasons given for cancellation of a solicitation for a stenographic services contract-the omission of clauses requiring bid and performance bonds, the omission of an organizational conflict of interest clause, Ace–Federal's alleged non-compliance with quarterly sales reporting requirement, the fact that the contract did not reflect recent

---

with the Revised GE. *See* March 16, 2004 hearing transcript ("Tr.") at 59, 71, and 86; Def.'s Mot. at 17, n. 10 ("the Contracting Officer has acknowledged that the Revised GE 'brings Great Lakes' bid to within the awardable range, in accordance with 33 U.S.C. § 624(a).' She has also acknowledged that '[t]he issue with regard to the Section 902

limit has been resolved' because Congress increased the spending authorization on the overall Brunswick Harbor Deepening Project."); *id.* at 19–29 (arguing that the "main reason" for cancellation was that the specifications were inadequate, but not arguing that GLDD's bid was unreasonable).

changes to the Service Contract Act, and the fact that the IFB did not include a clause referring to the potential loss of exhibits by a stenographer-fail to establish a compelling reason to cancel).

### D. The Contracting Officer's Decision to Cancel the Solicitation was Arbitrary and Capricious

■ In its December 24 Memorandum, the Corps identified three reasons for canceling the solicitation. As discussed above, however, the Government now relies on only one of those bases. As justification for cancelling the solicitation, the Government contends that the specifications were inadequate. Specifically, the Government claims that the solicitation was defective because it did not contain sufficient information regarding the hardness of the rock to be dredged, it prohibited blasting or other pre-treatment of the rock, and it did not provide for an open-water disposal site, resulting in decreased competition and inflated bids from those companies that did compete. *See* AR Tab 2 at 2. The Government further states that because of the "very restrictive specifications" the Corps inadvertently sole-sourced the contract to GLDD.[26] *Id.* The Government's contentions, however, are not supported by the administrative record. The Court will address these specific "defects" *seriatim,* but we will first discuss two overarching problems with the Government's arguments.

1.  *The Government's Analysis and Findings are Based on the Erroneous Assumption that the Original Government Estimate Was Correct*

The analysis that the Government relies on to justify its decision to cancel the solicitation is permeated by the incorrect assumption that the Original GE was accurate and that the bids were unreasonably high. Although the Government is no longer relying on the unreasonableness of the bids as a rational basis for the cancellation,[27] much of the analysis regarding the alleged inadequacies of the specifications is based on the premise

that the bids were unreasonably high. In that regard, the Corps' actions regarding GLDD's protest of the Original GE are relevant. Because the Corps did not resolve, or even fully consider, GLDD's protest prior to canceling the solicitation, it was unaware until after cancellation that the Original GE was too low by a substantial amount.

The administrative record indicates that the inadequate specification determination is an attempt to explain away a problem that the Corps thought existed, but does not, in reality, exist. In its report to the Corps, the ECDT stated, "There is no provision for blasting in the specs. This was one of the largest factors contributing to the *high bid costs.*" AR Tab 50 at 1080 (emphasis added). The Corps' reliance on this erroneous premise can also be seen in the December 24 Memorandum itself: "In short, the inability to blast, the unknowns surrounding the hardness of the rock, and the quantities and locations of the rock caused bidders to *increase their bids.*" AR Tab 2 at 2–3 (emphasis added). The Corps' failure to timely provide GLDD with the Original GE and supporting data resulted in the Contracting Officer not having all the relevant facts-and even worse, she had wrong information-when making her decision to cancel the solicitation.

2.  *The Record Does Not Support the Government's Contention that the Specifications Were Unnecessarily Restrictive or that the Solicitation Overstated the Government's Needs*

The Government, both in its briefs and at oral argument, repeatedly describes the solicitation as being "unnecessarily restrictive" and overstating the Government's needs.[28] Citing the Competition in Contracting Act ("CICA"), the Government states that it is required to solicit proposals "in a manner designed to achieve full and open competition for procurement." 41 U.S.C. § 253(a)(1)(A) (2000); 10 U.S.C. § 2305(a)(1)(A) (2000). The Government further posits that a consequence of this duty is the requirement that

---

26.  Def.'s Mot. at 22.

27.  *See supra* note 25.

28.  Def.'s Mot. at 26–27; Tr. at 59.

solicitation provisions that restrict competition be used only "to the extent necessary to satisfy the needs of the agency or as authorized by law." 41 U.S.C. § 253(a)(2)(B) (2000); 10 U.S.C. § 2305(a)(1)(B)(ii) (2000). Unnecessarily restrictive specifications or requirements that might unduly limit the number of bidders are prohibited. 48 C.F.R. § 14.101(a) (2004). Defendant also cites several cases for the proposition that cancellation of a solicitation is proper when an agency's requirements have been overstated. *See Vanguard Security*, 20 Cl.Ct. 90; *Siemens Power Corp.*, Comp. Gen. Dec. B–257167, 94–2 C.P.D. ¶ 160, 1994 WL 441363; *American Television Sys.*, B–220087.3, 86–1 C.P.D. ¶ 562, 1986 WL 63665; *Jarrett S. Blankenship Co.*, Comp. Gen. Dec. B–211582, 83–2 C.P.D. ¶ 516, 1983 WL 27560; *Lesko Assoc., Inc.*, B–209703, 83–1 C.P.D. ¶ 443, 1983 WL 26770.

These authorities, however, are inapposite to the case at bar. The Government needed, and still does need, a contractor to dredge the Brunswick Inner Harbor. The administrative record supports the finding that at the time of issuance, and at the time of cancellation, the Government needed a contractor who could perform that work without blasting or pre-treating the rock, and without access to an open-water disposal site, because the Government did not have the necessary permits.[29] AR Tab 13 at 429. Thus, a solicitation that called for dredging without pre-treatment or an open-water disposal site may have been restrictive, but necessarily so. It was not an inadequacy in the solicitation, but rather the nature of the work to be performed, that resulted in the restrictive IFB. Because the administrative record contains no evidence that the Government reasonably believed that the underlying restraints inherent in dredging the Brunswick Inner Harbor (*i.e.*, that the Corps could get the necessary permits) could be rectified,[30] the decision to cancel the solicitation based on the notion that the specifications were unnecessarily restrictive or overstated the Government's needs was not rational.

### 3. *The Corps Provided Adequate Geotechnical Data*

Defendant claims that the IFB was inadequate because it did not provide sufficient geotechnical information to bidders regarding the rock to be dredged. AR Tab 2 at 3. Defendant further asserts that this lack of information resulted in too much risk being placed on bidders.[31] *Id.* Other than the conclusory statements made by the Contracting Officer in the December 24 Memorandum, the administrative record does not support these contentions. In fact, the administrative record demonstrates that the original IFB contained extensive information about the materials to be dredged, that the Corps provided even more information in IFB amendments issued in response to bidder inquiries, that the Contracting Officer made a specific finding just prior to bid opening that the solicitation was adequate, and that the ECDT confirmed, after bids were opened, that sufficient geotechnical data had been provided.

The Government, in its reply brief, emphasizes that there were unknowns regarding the strength of the rock.[32] In such situations, however, there are always going to be unknowns. The nature of new work dredging is such that it is impossible to know the hardness of *all* the rock to be dredged. The issue is not whether the IFB eliminated *all* unknowns regarding the rock, but rather, whether the IFB provided sufficient information about rock strength for contractors to use in estimating their costs for the project. The administrative record indicates that sufficient information regarding rock strength was provided to prospective bidders.

The IFB contained a 21–page section (Section 02325) regarding dredging requirements. AR Tab 5 at 274–294. Paragraphs 5.2 and

---

29. *See* Def.'s Reply at 9.

30. The Government cites two references in the administrative record that mention permits. There is no indication from those documents, however, that prior to the December 24, 2002 cancellation, the Corps took any action to get the necessary permits. *See infra* discussion at 366–67.

31. Def.'s Reply at 23.

32. *See, e.g.*, Def.'s Reply at 13–16.

5.3 of Section 02325 addressed the character of materials to be dredged. In addition to more than two pages of single-spaced text, the Corps provided Appendix A, which contained logs of 198 soil borings relating to the materials to be dredged and Appendix B, which contained over 600 lab test results, including 43 unconfined compressive strength test results relating to the strength of the rock to be dredged.[33] AR Tab 5 at 280. Further, the Corps allowed prospective bidders to view 66 core samples, as well as observe a test dig. AR Tab 11 at 364.

The Government emphasizes the fact that despite this information, GLDD had questions and concerns, reflected in GLDD's letter to the Corps, dated August 14, 2002. Defendant's reliance on this letter as a reason for cancelling the solicitation is misplaced. As discussed above, on August 14, 2002, GLDD wrote a letter to the Corps objecting to two sentences in ¶ 5.3.3 of Section 02325. AR Tab 44 at 1051. Those sentences referred to the rock at Kings Bay, Georgia. In support of the agency's decision to cancel the solicitation, the Government states that in the August 14 letter: "[GLDD] criticized the *initial* solicitation for its inclusion of representations that prospective bidders could anticipate encountering highly-compressed rock that would exceed 8,100 psi and possibly up to 19,395 psi, as they felt this may have scared away bidders who did not think they could remove such rock, with or without blasting or other pre-treatment." [34] The Government misses the point—the Corps agreed with GLDD and issued Amendment 0006 deleting the two sentences that referred to Kings Bay rock. Thus, the solicitation as bid on, did not contain references to rock that exceeded 8,100 psi. The Government is attempting to rationalize cancellation based on a flaw in the specification *that was corrected prior to submission of bids.* Clearly, such a flaw cannot provide a rational basis for cancelling a solicitation after bid opening.

The Government next relies on GLDD's questions set forth in its August 16, 2002 letter as evidence that the IFB did not contain adequate data regarding hardness of the rock. Again, this argument lacks merit. In its letter of August 16, 2002, GLDD sought more information regarding rock strength. GLDD asked the Corps to test additional samples that were in the Corps' possession. AR Tab 46 at 1061–63. The Corps fully responded to GLDD's request in Amendment 0006, issued on September 26, 2002. AR Tab 13 at 401.

GLDD sent a third letter, dated October 1, 2002, asking the Corps to explain why some unconfined compressive strength test results from the same sample varied significantly. AR Tab 47 at 1064–65. Again, the Corps responded to GLDD's questions. *See* Amendment 0007, AR Tab 14 at 459. Defendant suggests that Amendment 0007 was insufficient because it did not contain any further test results.[35] But GLDD had not requested any further test results in the October 1, 2002 letter, and was satisfied with the Corps' response. *See* AR Tab 47.

Just two days before the bids were due, the Corps made an independent judgment that the IFB was adequate. On October 15, 2002, the Contracting Officer wrote to Bean Stuyvesant. AR Tab 17 at 471. The Contracting Officer denied Bean's request for a further extension of the bid opening date

> based upon the fact that the project solicitation is adequate as it now stands and is considered biddable. There is also a need to move forward on this project as there have already been numerous bid opening date extensions, which we believe have been thoroughly addressed resulting in a sound solicitation document.

AR Tab 17 at 471.

The most telling evidence that the IFB provided sufficient geotechnical data is that three contractors submitted bids. AR Tabs 18, 19, 20. GLDD, Bean Stuyvesant, and Weeks are the three largest dredgers in the

---

33. The Government did not include Appendix A or Appendix B in the record, but these appendices are referenced at AR Tab 5 at 280.

34. Def.'s Mot. at 22 (citing AR at Tab 23; Tab 50 at 1080–89) (emphasis added).

35. Def.'s Mot. at 11.

364

United States and they have performed virtually all rock dredging in the United States for the past twenty-five years.[36] These are sophisticated bidders who would not have bid on a contract that did not provide sufficient geotechnical data. Furthermore, in a federal construction contract, such as in the case at bar, a contractor is required to submit a bid bond when submitting its bid. Tr. at 40–41. The bid bond requires that the successful bidder supply a performance bond. The performance bond guarantees that the work will be done, even if the contractor cannot finish the work. *Id.* at 41; *see also* AR Tab 5 at 93–94. No surety issues a performance bond without requiring an indemnification agreement from the contractor. Tr. at 40–41. Thus, every time a contractor submits a bit, it is putting its corporate assets on the line. *Id.* The fact that three contractors bid for this project under those circumstances is strong evidence that the bidders themselves determined that the IFB provided sufficient geotechnical data.

Lastly, in its post-opening evaluation of the solicitation, the ECDT determined that the Corps "has provided sufficient geotechnical information for a contractor to use in estimating the job." AR Tab 50 at 1080. Thus, even after the bids were opened and the Corps believed that the bids were unreasonably high, the ECDT determined that whatever problem existed, there was no problem regarding the information as to the rock to be dredged. And in accordance with that determination by the ECDT, the administrative record makes no reference to any intention by the Corps to provide more borings or core samples in connection with the contemplated resolicitation. If the Corps had provided insufficient information such that cancellation was warranted, a reasonable course of action would have been to make some provision for providing additional information to the bidders when issuing the new IFB. The Corps made no such provision.

For the reasons discussed above, the administrative record contradicts the Government's position regarding the sufficiency of the geotechnical data provided to the bidders. The Corps has failed to articulate a rational connection between the facts found and the choice made. Accordingly, the Contracting Officer's reliance, in cancelling the solicitation, upon the assertion that the specifications "did not contain sufficient information regarding the hardness of the rock to be dredged" is arbitrary and capricious. *See generally Overstreet Elec.,* 47 Fed.Cl. at 742.

4. *There is No Support in the Administrative Record for the Assertion that the Prohibition on Blasting or Other Pre–Treating of Rock Limited Competition or Increased Risk*

The Government next faults the specifications for failing to allow blasting or other pre-treating. AR Tab 2 at 2–3. The Government claims that the prohibition on blasting reduced competition[37] and caused those contractors that did bid to increase their prices to incorporate the risk that they would not be able to dredge through the rock.[38] *Id.* The Government relies heavily in this regard on the Contracting Officer's November 22 notes that GLDD stated: "No blasting seems to be big issue" because although it "doesn't mean cheaper," it means "that you can get it done." AR Tab 25 at 566–67. Additionally, the ECDT told the project management team that the prohibition on blasting "was one of the largest factors contributing to the high bid costs." AR Tab 50 at 1080.

a. *The Administrative Record Contains no Reliable Evidence that the Prohibition Reduced Competition*

The Government contends that because mechanical, clamshell, or low power hydraulic dredges could not dredge without blasting, the prohibition on blasting "significantly reduced the number of companies that could perform the work," thereby limiting competition. AR Tab 2 at 2; Tab 50 at 1080–89. The record reveals, however, that the Corps did not conduct any research or do any cost comparisons to determine what, if any, other contractors would be able to bid competitive-

36. Pl.'s Cross–Mot. at 4.

37. Def.'s Mot. at 23.

38. *Id.* at 24–25.

ly on a resolicitation. Thus, while blasting (and an open-water disposal site) may have permitted a mechanical dredger to bid, there is no indication that it would have been *competitive*. In fact, the only evidence in the record relating to this point indicates that mechanical dredges would not be competitive with hydraulic dredges. *See* AR Tab 2 at 2; Tab 50 at 1096.

This lack of research and investigation by the Corps was evident, even at oral argument. The Government focused much attention on Norfolk dredging, stating that because of the prohibition on blasting, one-fourth of the prospective bidders who attended the core sample display did not bid on the project. Tr. at 64, 66, 67, 76. The Government alleges that Norfolk did not compete because the specifications prohibited blasting. *Id.* Nothing in the record suggests that Norfolk would have bid if blasting had been permitted. There is no record of any other discussions with Norfolk regarding why it did not bid or under what circumstance it would have bid. Additionally, Norfolk did not file a protest alleging that the specifications were too restrictive. Indeed, the only mention of Norfolk was that its representative attended the August 6 analysis of core samples and decided that Norfolk could not perform the project. AR Tab 11 at 365. This hardly provides support for the argument that blasting restricted competition.

The Government suggested at oral argument, more than 15 months after cancellation, that Norfolk would have and could have bid on this project if blasting had been allowed. Tr. at 64, 66, 67. Plaintiff rebutted the Government's assertion and informed the Court that as a rule Norfolk "does not bid rock projects. They don't have the equipment for it, and the notion that allowing blasting would help Norfolk is speculation, and, we think, wrong speculation because Norfolk doesn't own any blasting equipment. It doesn't use it. It doesn't need it. It doesn't do rock projects." Tr. at 119–20. The point, as far as the Court is concerned, is not whether Norfolk does or does not "do rock projects." Rather, the point is that the Corps did not investigate that matter prior to cancellation. After-the-fact rationalizations

for agency actions should be rejected, and legal arguments for agency actions must find support in the administrative record. *Overton Park*, 401 U.S. at 419, 91 S.Ct. 814. The assertion that Norfolk could have bid on this project if blasting had been allowed is an after-the-fact rationalization that is without support in the administrative record.

Basically, the Corps contends that it cancelled the solicitation because the specifications reduced competition, but it conducted no research or analysis into whether, if the prohibition on blasting had been removed, any other contractors would have been able to bid competitively. A decision made without all relevant information is arbitrary and capricious. *See Antarctic*, 46 Fed.Cl. at 154. Further, an agency's unsupported speculation that resolicitation will increase competition or reduce prices does not provide a rational basis to cancel a solicitation. Because there is no basis in the administrative record to support the Government's contention that the prohibition on blasting reduced competition, the Court concludes that cancellation on that ground was arbitrary and capricious. *See id.*

b. *The Prohibition Did Not Result in Bidders Impermissibly Incorporating Risk into Their Bids*

The Government contends that in addition to decreasing competition, the prohibition on blasting resulted in higher bids because contractors impermissibly incorporated risk into their bids. AR Tab 2 at 2–3. The Government relies on GLDD's pre-Amendment 006 letters to the Corps and the Contracting Officer's notes from the November 22 meeting with GLDD to support this theory. AR Tab 25 at 566–67. To the extent that the Government relies on GLDD's August 14, 2002 letter objecting to the inclusion of Kings Bay rock in the solicitation, such reliance is misplaced, as those references were deleted in September 26, 2002 when the Corps issued Amendment 0006. AR Tab 13 at 399. Thereafter, pursuant to the IFB's Differing Site Conditions clause, the Government bore the risk that the contractor would encounter rock with an unconfined compressive strength of greater than 8,100 psi that it

could not dredge. *See* 48 C.F.R. § 52.236–2. Thus, the issues regarding improper risk shifting were resolved prior to bid submission, and do not constitute a proper basis for cancelling the solicitation.

During the November 22 meeting, GLDD explained to the Corps why its bid was reasonable, and the Original GE and the ECDT's estimate were too low. GLDD also provided the Corps with an estimate of what it would cost a well-equipped dredging contractor to perform the work. At that meeting, GLDD informed the Corps that a well-equipped contractor could perform the work for about $87 million "plus risk." AR Tab 25 at 567. The Government has focused on the "plus risk" statement and concluded that the specifications caused the bidders to impermissibly incorporate risk into their bids. The Government's reliance on GLDD's statement to support its theory is unwarranted because there is no evidence in the administrative record that any of the bidders "incorporated higher risk" into the bids.

The second lowest bid was Bean Stuyvesant's bid of $91,689,020, which is within approximately 5.4% of GLDD's standard industry estimate. Although the administrative record does not include Bean Stuyvesant's supporting data, 5.4% does not seem like an unreasonable amount of profit or risk to include in a bid for this type of project.[39] Weeks was the highest bidder with a bid of $123,814,750. The administrative record does not include Weeks' supporting data, so there is no way to determine how it calculated its bid. But just as the Court cannot determine how Weeks' reached its bid, the Contracting Officer likewise had no basis for determining that Weeks' had improperly padded its bid to account for risk.

The only bidder for which the Corps had cost data was GLDD. That information was provided to the Corps on December 4, 2002, in connection with GLDD's protest of the Original GE. AR Tab 30. Thus, the Contracting Officer had that information when she decided to cancel the solicitation on De-

cember 24, 2002. GLDD's bid was $65.9 million, which is significantly lower than the cost of a "well-equipped dredging contractor" quoted by GLDD at the November 22 meeting.[40] A careful reading of this supporting data indicates that GLDD did not pad its bid. AR Tab 30.[* * *].[41] AR Tab 30 at 575.

The Court recognizes that it cannot substitute its own judgment for that of the Contracting Officer. *See Seaborn Health Care*, 55 Fed.Cl. at 523. To the extent that the Government claims that the prohibition on blasting resulted in improperly inflated bids, however, the onus is on the Government to point to those items in the administrative record that support its contention. When the Court asked the Government to explain where in GLDD's supporting data the Government believes that GLDD incorporated excess risk, the Government was unable to find such a risk provision:

> We can't tell, one way or the other, by just looking at their costs, their estimate and the details of their estimate that they provided us in December. The Contracting Officer could look at it forever. You could look at it forever. I could look at it forever. We wouldn't be able to tell, one way or the other, whether there is risk incorporated in that or not.

Tr. at 97–98.

The most reliable information in the administrative record regarding how a contractor calculated its price for this project contradicts, or at the very least does not support, the Corps' position that the prohibition on blasting resulted in inflated bids. AR Tab 30. The Government conceded that it did not know if and to what extent GLDD incorporated risk into its bid. Accordingly, with respect to the relationship between the prohibition on blasting and the magnitude of the bids, GLDD met its burden of showing that the agency did not consider all relevant factors and failed to articulate a rational connection between the facts found and the

---

**39.** Pl.'s Reply at 11 n. 8.

**40.** As discussed *supra* at 356–57 and *infra* at 368, this is because GLDD has proposed to utilize its

dredge Texas, which is the most powerful dredge in the industry.

**41.** Pl.'s Reply at 11; Tr. at 44–48.

choice made. *See Overstreet Elec.*, 47 Fed. Cl. at 742; *Antarctic*, 46 Fed.Cl. at 154.

### c. At the Time of Cancellation, the Corps Had No Idea Whether it Could Get the Necessary Permits To Allow Blasting

The last, and perhaps most fundamental, problem with the Government's argument that cancellation was proper because the specifications were inadequate in that the solicitation prohibited blasting or pre-treatment is that at the time of cancellation the Corps did not know if it could ever obtain the necessary environmental permits. The Government claims that the prohibition on blasting was "unnecessarily restrictive." [42] But the restriction was only unnecessary if the Government had some basis for believing when it cancelled the IFB that it could remove the restriction. The original solicitation was silent as to whether blasting would be permitted. AR Tab 5. In its August 14, 2002 letter to the Corps, GLDD stated that since the IFB did not mention blasting, it had assumed that blasting was prohibited. AR Tab 44 at 1051 and 1056. When the Corps issued Amendment 006, it specifically addressed this issue:

> At·this time, no blasting is allowed during the contract. The Government has not and will not obtain environmental approvals for blasting on Brunswick Harbor. The process to obtain permits and approvals for blasting would be a very lengthy process (with no assurance that approval will be given at the end of the coordination effort) .... Due to the year round presence of manatees and other factors, it may not be possible to obtain approval for blasting.

IFB Section 02325 ¶ 1.1.2 (Amend.0006), AR Tab 13 at 429.

A rational contracting officer faced with the prospect of cancelling a solicitation because it prohibited blasting would investigate whether a new solicitation could permit blasting. The Government cites two mentions of permits in the administrative record, neither of which indicate that any progress had been made toward securing the necessary permits at the time the solicitation was cancelled. *See* AR Tab 50 at 1080, 1090. The first of those citations is an e-mail dated November 17, 2002 that lists as a "current action" item: "begin consultation with agencies to allow blasting." AR Tab 50 at 1080. The second mention of the permits is in an e-mail dated December 10, 2002 that lists "environmental clearances in general" as an agenda item for an upcoming project delivery team meeting. AR Tab 50 at 1090. At oral argument, the Government conceded that "there is nothing further in the record" on this point. Tr. at 81.

The Government argues that it does not have to show that prior to cancellation it "absolutely, 100 percent, ma[de] certain [it was] going to get the environmental clearances." Tr. at 82. The Government is correct that it did not have to know for sure that it would be able to get the permits. But the Government is not even able to show that it investigated getting the permits. The administrative record contains nothing to indicate that the Corps contacted the appropriate agencies, completed any applications, or even obtained an estimate as to how long it would take to get the permits. According to the administrative record, the Corps did *nothing* prior to December 24, 2002 to support a belief that it would be able to obtain the necessary permits to allow blasting or pre-treatment in a resolicitation. On September 26, 2002 the Corps was unsure whether it would ever be able to obtain the necessary permits to allow blasting. As of December 24, 2002, there is no evidence in the administrative record that the situation had changed at all. Thus, even if the ECDT was correct that the preclusion of blasting was a defect in the specifications (which, for the reasons discussed above, it was not), the Contracting Officer's utter failure to investigate whether blasting could, as a practical and legal matter, be permitted, renders her reliance on the solicitation's prohibition on blasting arbitrary and capricious. *See Overstreet Elec.*, 47 Fed.Cl. at 742; *Antarctic*, 46 Fed.Cl. at 154.

---

**42.** Def.'s Mot. at 26–27.

5. *The Fact that the Solicitation Failed to Provide for an Alternative Open Water Disposal Site is Not a Compelling Reason for Cancellation*

The argument that failure to provide an open water site restricted competition and thus constituted a compelling reason to cancel the solicitation, is closely intertwined with the arguments regarding the prohibition on blasting. An open water disposal site is only needed for mechanical dredges. *See* AR Tab 50 at 1080. Failure to provide an open water site had no effect on the bidders because each of them proposed to use a hydraulic dredge and did not need an open water site. Thus, the only potential negative impact that the lack of an open water disposal site could have had on the solicitation was to restrict competition. But, as shown above, firms using mechanical dredges could not, in fact, have submitted competitive bids. For the reasons discussed above therefore, the failure to provide an open water site is not a compelling reason to cancel the solicitation. *See supra*, 4. a. and 4. c. Based on the administrative record, the Court concludes that the agency failed to consider all relevant factors and did not articulate a rational connection between the facts found and the choice made. *Antarctic*, 46 Fed.Cl. at 154.

6. *The Government's Sole–Source Argument Lacks a Factual and Legal Basis*

The Government's last argument is that the specifications unintentionally sole-sourced the contract to GLDD. In support of this argument, the Government relies on the Contracting Officer's notes from the November 22 meeting with GLDD, a statement made by the ECDT, and the fact that GLDD's bid was significantly less than the bids of Bean Stuyvesant and Weeks. The Government is particularly focused on the statement in the Contracting Officer's notes: "Texas–Only one." AR Tab 25 at 565–567. In the December 24 Memorandum, the Contracting Officer relied on that note and stated that the Texas was "the only hydraulic

dredge in the industry capable of efficiently dredging the rock." AR Tab 2 at 3.

The ECDT stated that "[i]n effect, [the Corps] limited the competitive field to ONE bidder since Great Lakes is the only outfit that can truly dig this type of rock without relying on mechanical means." AR Tab 50 at 1080. There is no explanation provided as to how the ECDT came to that conclusion. Furthermore, it is unclear what "this type of rock" refers to. The preceding sentence refers to the Kings Bay rock (19,000 psi) that had already been removed from the IFB. To the extent that the ECDT was referring to the Kings Bay rock, it is irrelevant which firm or firms could dig that rock, because references to that rock had been deleted from the solicitation. The fact that the ECDT did not seem to be aware of what provisions were included in the IFB at the time of bidding should have alerted the Contracting Officer to the fact that the team's conclusions could not be taken at face value.

"Sole-source" is a term of art. A sole-source contract results when the Government negotiates with only one contractor. 48 C.F.R. § 2.101. That is not what happened here. Rather, the Corps solicited sealed bids for the Brunswick Inner Harbor work and received three bids. AR Tabs 18, 19, 20. Despite what the Government is now arguing, Bean Stuyvesant and Weeks clearly believed that they had dredges capable of performing the contract. In addition to the fact that the Corps received three bids, as a result of the pre-bid core display and test dig, which were attended by all three bidders, AR Tab 11, GLDD and the other bidders *were aware* that their competitors were interested in the project and would likely submit bids. Federal procurement regulations recognize that competition occurs even if only one offer is submitted so long as circumstances indicate that at least one other offeror intended to submit a bid. 48 C.F.R. § 15.403–1(c)(1)(ii)(A)(1).[43]

---

**43.** This provision creates an exception from the requirement that a contractor provide cost and pricing data in connection with a negotiated procurement. The government does not require such data when there is sufficient competition because presumably in a competitive environment, the Government is getting a fair price.

Furthermore, the fact that GLDD had the most efficient dredge and could therefore bid lower than its competitors does not constitute a compelling reason to cancel the solicitation. The GAO has long recognized that:

certain firms may enjoy a competitive advantage by virtue of their incumbency or their own particular circumstances. . . . We know of no requirement for equalizing competition by taking into consideration these types of advantages, nor do we know of any possible way in which such equalization could be effected.

*Telos Computing, Inc.,* B–190105, 78–1 CPD ¶ 235 at 17, 1978 WL 13390 (March 27, 1978); *see Information Ventures, Inc.,* B–221287, 86–1 CPD ¶ 234 at 7, 1986 WL 63231 (March 10, 1986) ("contracting agencies are not required to attempt to equalize competition or to compensate for the experiences, resources, or skills that one offeror has obtained as a result of its particular circumstances"). GLDD should not be penalized for investing in the best equipment. The fact that GLDD could submit a lower bid benefits the Government, and certainly does not constitute a compelling reason to cancel the solicitation.

For the reasons discussed above, the Court concludes that the Contracting Officer's decision to cancel Solicitation number DACW21–02–B–0005 was arbitrary, capricious, and otherwise not in accordance with law. Accordingly, we must determine whether plaintiff is entitled to the equitable relief it seeks.

### E. INJUNCTIVE RELIEF

Plaintiff has requested that this Court set aside the December 24, 2002 cancellation and issue a permanent injunction directing the Corps to award a contract to GLDD under IFB No. DACW21–02–B–0005.[44] In a case such as this, the Court of Federal Claims has jurisdiction to award declaratory and injunctive relief; monetary relief shall be limited to bid preparation and proposal costs. 28 U.S.C. § 1491(b)(2). The Court of Appeals for the Federal Circuit, however, has reiterated that equitable powers "should be exercised in a way [that] best limits judicial interference in contract procurement." *Parcel 49C Ltd. P'ship v. United States,* 31 F.3d

44. Pl.'s Compl., Request for Relief at ¶¶ 2 and 3.

1147, 1153 (Fed.Cir.1994) (quoting *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1372 (Fed.Cir.1983)). The goal of injunctive relief should be to restore the status quo ante the illegal cancellation. *Parcel 49C,* 31 F.3d at 1154. "The ultimate grant of a contract should be left to the discretion of the government agency-the courts will not make contracts for the parties." *ManTech Telecoms. & Info. Sys. Corp. v. United States,* 49 Fed.Cl. 57, 79–80 (2001) (quoting *Scanwell Labs., Inc. v. Shaffer,* 424 F.2d 859, 869 (D.C.Cir.1970)) (internal quotations omitted).

Injunctive relief is an extraordinary remedy. *CACI, Inc.-Federal v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983). A court, however, may issue a permanent injunction if plaintiff establishes that: (1) it has achieved actual success on the merits; (2) it will suffer irreparable injury if injunctive relief is not granted; (3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted; and (4) granting the injunction serves the public interest. *See FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993); *Al Ghanim Combined Group v. United States,* 56 Fed.Cl. 502, 519–20 (2003); *Interstate Rock Products, Inc. v. United States,* 50 Fed.Cl. 349, 354 (2001). Having found above that plaintiff has achieved success on the merits, the Court will address the three remaining factors.

#### 1. *GLDD Will Suffer Irreparable Injury if Injunction Relief is Not Granted*

GLDD contends that it will be irreparably harmed if the cancellation is not set aside because it will be deprived of potential profits. The deprivation of potential profits has been found to constitute irreparable harm. *See Overstreet Elec.,* 47 Fed.Cl. at 744; *Quality Trans. Servs., Inc. v. United States,* 12 Cl.Ct. 276, 282 (1987) ("an unsuccessful bidder can show irreparable harm merely by alleging that it will not be awarded the contract and earn the consequent profits thereunder"). As the Court stated in *Bean*

*Dredging Corp. v. United States,* "without injunctive relief, a disappointed bidder would be irreparably harmed, because it could recover only bid preparation costs, not lost profits, through an action at law." 22 Cl.Ct. 519, 524 (1991).

There was some discussion during oral argument regarding whether [* * *] the contractor can claim that it will suffer irreparable injury due to loss of potential profits. This Court believes that it can. The [* * *] estimate, is simply that, an estimate. Because this is a fixed-price contract, if GLDD performs at a cost less than its estimate, it will make a profit, *i.e.,* GLDD retains the potential to profit from the contract, [* * *]. Tr. at 45.[* * *].

Lost profits is not the only way that a protestor can show irreparable injury. The denial of the right of a contractor to have its bid fairly and lawfully considered constitutes irreparable injury. *Overstreet Elec.,* 47 Fed. Cl. at 744 n. 25; *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 398 (1999); *Dairy Maid Dairy, Inc. v. United States,* 837 F.Supp. 1370, 1381 (E.D.Va.1993). Additionally, absent injunctive relief, GLDD's bid will be a "sitting duck," serving as a target in the next round of bidding. *See California Marine,* 42 Fed.Cl. at 292. The Government claims that GLDD will not be a sitting duck because the planned resolicitation will break the work into two portions. The Government's argument fails to consider, however, that the IFB did not require GLDD to submit a single lump sum price. It required GLDD to provide 30 separate line item prices, including 18 different dredging prices. AR Tab 13 at 403–410; Tab 22 at 562. Thus, even if the new solicitation were broken into two components, GLDD's competitors would still have a comprehensive price breakdown on how GLDD views the project, including GLDD's prices for the rock and non-rock areas.[45]

### 2. The Harm to GLDD if an Injunction is Not Granted Outweighs the Harm to the Government if an Injunction is Granted

The balance of harms weighs heavily in favor of granting the injunction. The harm to GLDD if an injunction is not granted is described above. Plaintiff correctly argues that the Government will suffer no harm if the Court grants the injunction. The Government will receive precisely what it solicited, and what it still needs-a contractor to dredge the Brunswick Inner Harbor-at a reasonable price as compared with the Revised GE. *See Bean Dredging Corp. v. United States,* 19 Cl.Ct. 561, 583 (1990) (in granting a permanent injunction "the relative harm to the defendant, if any, is slight, inasmuch as an award to plaintiffs would be at the lowest competitively bid price and would permit the work to be completed expeditiously").

### 3. Granting the Injunction Serves the Public Interest

It is well-established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations. *See, e.g., United Int'l Investigative Servs., Inc. v. United States,* 41 Fed.Cl. 312, 323 (1998). The Corps' attempt to cancel the IFB without a compelling reason violates FAR § 14.404–1 and undermines the integrity of the procurement process. *See Overstreet Elec.,* 47 Fed.Cl. at 744. Granting an injunction setting aside the improper cancellation serves the public interest.

### CONCLUSION

For the reasons set forth above, defendant's motion for judgment on the 'administrative record is DENIED. Plaintiff's motion for judgment on the administrative record is GRANTED. Plaintiff's motion for a permanent injunction is hereby GRANTED, as follows:

The Court ORDERS that the December 24, 2002 cancellation of IFB No. DACW21–02–B–0005 is hereby SET ASIDE. Defendant, the Army Corps of Engineers, its officers, agents, servants, employees, and representatives, and all persons acting in concert and participating with them on IFB No. DACW21–02–B–0005 are hereby PERMA-

---

45. Pl.'s Reply at 16.

NENTLY ENJOINED from proceeding with performance of the contract with any entity other than GLDD provided that the Corps finds GLDD to be a responsible contractor. Each party shall bear its own costs.

IT IS SO ORDERED.